William E. MINCEY, III, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, South Carolina Rural Letter Carriers' Association, and National Rural Letter Carriers' Association, Defendants.

No. 4:94–818–21.

United States District Court, D. South Carolina, Florence Division.

Feb. 3, 1995.

E.N. Zeigler, Florence, SC, for plaintiff.

Terri Hearn Bailey, Asst. U.S. Atty., Columbia, SC, William B. Peer, Washington, DC, for defendants.

## ORDER

TRAXLER, District Judge.

On August 10, 1992, William E. Mincey, III ("Mincey") resigned from his position as a rural mail carrier with the United States

Postal Service ("Postal Service"). Over a year and half later, Mincey filed this wrongful discharge/fair representation action against the Postal Service and the South Carolina Rural Letter Carriers' Association ("SCRLCA"). *See* 39 U.S.C.A. § 1208(b) (West 1980). Mincey subsequently filed an Amended Complaint, naming the National Rural Letter Carriers' Association ("NRLCA") as an additional defendant. The Postal Service, the SCRLCA and the NRLCA (collectively "Defendants") have filed motions to dismiss or in the alternative for summary judgment. After a thorough review of the record, the court concludes that the Defendants are entitled to summary judgment.

## I. FACTS

Viewed in the light most favorable to Mincey, the facts are as follows. From March 1976 through August 1992, Mincey was employed by the United States Postal Service at its facility in Nichols, South Carolina. During this period, Mincey was also a member of and a local steward for the SCRLCA and the NRLCA (collectively "the Union").

Mincey testified at his deposition that the events giving rise to his resignation began on August 8, 1992. That afternoon, Mincey rode with a friend to J.M. Stanley's Country Grocery Store to purchase gasoline. As they approached the store, Mincey noticed a van leave at a high rate of speed. When J.M. Stanley ("Stanley"), the store proprietor, did not come out of the store in response to their honk for service, Mincey and his friend climbed out of the car and walked into the store. As they entered the store, they discovered the body of Stanley; he had been shot and the store ransacked.

Mincey testified that in the days following Stanley's murder he became convinced that his life was in danger since he had seen the individuals who had shot Stanley fleeing the scene of the crime. As a result, he decide to sell his house, quit his job, and leave the state. Thus, on August 10, 1992, Mincey submitted a letter of resignation to Paula Cribb ("Cribb"), his supervisor at the Nichols Post Office. Because his resignation was unexpected, Cribb told Mincey that she would hold his letter for a day before sending it in.

Three days later, on August 13, 1992, Mincey sought to rescind his letter of resignation after learning that the individuals who had killed Stanley had been captured. Cribb told Mincey that she had submitted his letter of resignation to the Personnel Office two days earlier, but that she was willing to allow him to rescind it if his resignation had not already been processed and become effective. Using Cribb's phone, Mincey called the Personnel Office and asked whether he could withdraw his resignation. The Personnel Office informed Mincey that his resignation had already been entered into the computer and could not be revoked.

When Mincey relayed this information to Cribb, she suggested that he contact the State Steward for the SCRLCA, Brady Porth ("Porth"), and inquire about filing a grievance. Again using Cribb's phone, Mincey called Porth. When he could not immediately contact Porth, Mincey asked Cribb whether he could personally file a grievance with her. Cribb stated that she was not sure since he was no longer a postal employee, but that she would check and let him know what she found out. On August 20, 1992, Cribb contacted Mincey and informed him that because he was no longer a Postal Service employee he would have to proceed through the Union in order to file a grievance.

Meanwhile, Mincey had spoken with Porth who agreed to look into the matter. After obtaining additional information from Mincey and checking with other Union officials, Porth telephoned Mincey on September 4, 1992 and told him that it did not appear that the Postal Service had done anything wrong by refusing to allow him to rescind his resignation. Therefore, he told Mincey that the Union did not intend to file a grievance on his behalf.

Approximately one month later, Mincey was admitted to Mullins Hospital after attempting to commit suicide. He was treated there until October 15, 1992 when he was discharged. The following day Mincey was admitted to the Addiction Treatment Unit of the Dorn Veterans' Hospital in Columbia,

South Carolina ("Veterans' Hospital") where he underwent a twenty-eight day treatment program for drug and alcohol addiction. He also participated in a group therapy session for post-traumatic stress disorder. As he was preparing to be discharged on November 13, 1992, Mincey spoke with a guidance counselor who suggested that Mincey file for unemployment compensation. The counselor further suggested that Mincey had a right to rescind his resignation and that he should contact an attorney if the Union could do nothing further.

As a result of the counselor's urging, Mincey filed for unemployment benefits. Although his application was initially denied, Mincey appealed the decision and eventually obtained benefits. Mincey also contacted Porth again and inquired as to whether his psychological problems provided a basis for allowing him to withdraw his resignation. Porth stated that they might if Mincey could produce evidence that he was unable to think rationally at the time he tendered his resignation. Mincey did not contact an attorney.

In July 1993, Mincey wrote to Leo J. Root ("Root"), Director of Labor Relations for the NRLCA, requesting additional advice regarding the possibility of rescinding his resignation. Root responded in a letter dated July 27, 1993, stating that he was sympathetic to Mincey's plight and that he had instructed Porth to initiate a grievance on Mincey's behalf but "that the chances of success on this issue are not very good, especially since you resigned almost a year ago."

Porth subsequently inquired of the Veterans' Hospital whether Mincey was competent in August 1992 to make a rational decision regarding his resignation. In a letter dated September 10, 1993, the Hospital replied:

[I]t is the opinion of Dr. Praxedes Sebastian that a determination cannot be made as to whether or not Mr. Mincey was of a sound state of mind in August 1992 to make a rational decision with regards to resigning from his job. Dr. Sebastian treated Mr. Mincey only for poly-substance abuse while he was hospitalized from October 16, 1992 to November 13, 1992.

Porth relayed this information to Mincey and stated that based on the lack of evidence of psychological impairment he did not intend to file a grievance on Mincey's behalf. At Mincey's request, Porth memorialized his decision in a letter dated September 20, 1993.

Thereafter, Mincey hired an attorney. Mincey's attorney sent a letter to the Union dated March 14, 1994, demanding that the Union file a grievance. Attached to the letter was the opinion of Dr. Harold Morgan, a psychiatrist, stating that Mincey was unable to think rationally at the time he resigned from his position as a rural mail carrier. Three days later, on March 17, 1994, Mincey filed this action.

The Postal Service seeks dismissal of the action pursuant to Federal Rule Civil Procedure 12(b)(1) on the ground that Mincey has failed to allege an adequate jurisdictional basis for his claim. The Postal Service also seeks dismissal of Mincey's claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it was not timely filed. Finally, the Postal Service argues that it is entitled to summary judgment because Mincey has failed to produce any evidence demonstrating that the Postal Services' refusal to reinstate him violated the National Agreement. The SCRLCA and NRLCA join in each of the arguments raised by the Postal Service, and the SCRLCA additionally asserts that it should be dismissed from the action because it was not a party to the collective bargaining agreement between Postal Service and the NRLCA.

## II.  DISCUSSION

### A.  *Motions to Dismiss.*

Because the court has allowed Mincey to amend his complaint to set forth the correct statutory basis for his claim, the motion to dismiss for lack of subject matter jurisdiction is moot. The court also denies the SCRLCA's motion to dismiss based on its assertion that it was not a party to the collective bargaining agreement between Postal Service and the NRLCA (hereinafter "National Agreement"). Mincey does not contend that the SCRLCA violated a provision of the National Agreement; rather, he maintains that the SCRLCA violated its duty of fair representation. Finally, because mat-

ters outside the pleadings have been presented, the court concludes that the motion to dismiss for lack of timely filing is properly treated as a motion for summary judgment under Federal Rule of Civil Procedure 56. *See* Fed.R.Civ.P. 12(b).

### B. *Motion for Summary Judgment.*

#### 1) Summary Judgment Standard.

Federal Rule of Civil Procedure 56(c) states that upon a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, judgment for the movant is proper if he demonstrates that: (1) there is no genuine issue as to any material fact; and (2) he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2514–15. In determining whether a genuine issue of material fact has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must produce evidence to establish the existence of every essential element of his action on which he will bear the burden of proof at trial—demonstrating that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.

Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and the parties become entrenched in frivolous litigation. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Thus, courts should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989); *Mieri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978); *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 134 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins.,* 725 F.Supp. 1489, 1490 (S.D.Ind. 1989). In a recent trilogy of decisions—*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)—the Supreme Court reaffirmed its endorsement of the pretrial resolution and summary disposition of baseless actions, emphasizing the mandatory nature of the Rule 56(c). In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held:

> The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a

jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citations omitted).

### 2) Statute of Limitations.

■ Mincey relies on § 1208(b) of the Postal Reorganization Act as the basis for his wrongful discharge/fair representation claim. 39 U.S.C.A. § 1208(b). Because § 1208(b) is the statutory analogue to § 301(a) of the Labor Management Relations Act, the Fourth Circuit has concluded that the six-month statute of limitations applicable to claims brought under § 301(a) is also applicable to claims brought under § 1208(b). *Trent v. Bolger*, 837 F.2d 657, 659 (4th Cir. 1988). The Defendants argue that Mincey's claim, which was filed over a year and a half after his resignation, clearly was not filed within the six-month limitations period. Mincey asserts that his claim was timely filed because his cause of action did not accrue until September 20, 1993, when he received written notice that the Union would not file a grievance on his behalf. He further contends that if his cause of action did accrue prior to September 20, 1993, the six-month statute of limitations should be equitably tolled due to his mental incompetency during the limitations period.

■ "A cause of action ordinarily accrues when [a] plaintiff could first have successfully maintained a suit based on that cause of action." *Santos v. District Council of New York City*, 619 F.2d 963, 968–69 (2d Cir.1980) (internal quotes omitted). An action by an employee alleging both that his employer violated the terms of the collective bargaining agreement and that the union breached its duty of fair representation is a hybrid action, "amounting to a direct challenge to the private settlement of disputes under [the collective bargaining agreement]." *DelCostello v. International Bhd. of Team-*

*sters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983) (alteration in original, internal quotes omitted). Such a claim requires proof of two elements: (1) that the employer violated the terms of the collective bargaining agreement; and (2) that the union breached its duty of fair representation by acting in "discriminatory, dishonest, arbitrary, or perfunctory fashion." *Id.* at 164, 103 S.Ct. at 2290. Both elements must be established in order to prevail against either party. *Id.* at 165, 103 S.Ct. at 2291. Accordingly, courts have uniformly held that the limitations period on such a claim does not commence merely upon an employer's violation of a collective bargaining agreement, but only when the employee also obtains actual or imputed knowledge of the conduct alleged to constitute a breach of the union's duty of fair representation. *See, e.g., Flanigan v. Truck Drivers Local 671,* 942 F.2d 824, 827 (2d Cir.1991).

Mincey maintains that the Union breached its duty of fair representation by failing to file a grievance challenging the Postal Services' refusal to allow him to withdraw his resignation. By his own admission in his deposition testimony, Mincey considered Porth's September 4, 1992 decision not to file a grievance on his behalf to be "final." Thus, Mincey was on notice as of that date that the Union had breached any duty it had to file a grievance on his behalf.

Porth's reiteration of his decision not to file a grievance on Mincey's behalf, memorialized in the letter of September 20, 1993, was purely the result of Mincey's renewed effort to convince the Union to file a grievance. Courts addressing similar factual scenarios have concluded that the statute of limitations begins to run on the date when the aggrieved employee first obtains actual or imputed knowledge of a decision by union officials not to act on the employee's behalf. *See, e.g., Pantoja v. Holland Motor Exp., Inc.,* 965 F.2d 323, 326–29 (7th Cir.1992); *Santos,* 619 F.2d at 969.[1] To conclude other-

---

1. The Seventh Circuit has concluded that the limitations period for filing a hybrid § 301(a) claim should be tolled while an employee pursues specific internal union remedies. *Frandsen v. Brotherhood of Ry., Airline & S.S. Clerks,* 782

F.2d 674, 681 (7th Cir.1986). Mincey, however, does not allege that he pursued any internal union remedies. Rather, he states that he continued to present the same request to various officials within the Union.

wise would be to allow an employee to perpetually postpone the accrual of a cause of action by continuing to request that the union act on the same complaint. Because the Postal Service allegedly breached the National Agreement prior to September 4, 1992 and Mincey received actual notice of Porth's decision not to pursue a grievance on that date, Mincey's cause of action accrued on that date. Therefore, his claim was not timely filed and is barred by the six-month statute of limitations unless the limitations period should be equitably tolled due to Mincey's alleged mental incompetency.

■ When a claim would otherwise be barred by a statute of limitations, the plaintiff bears the burden of proving that the limitations period should be equitably tolled. *Crawford v. United States,* 796 F.2d 924, 929 (7th Cir.1986). Traditionally, the doctrine of equitable tolling has been applied sparingly, *see Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990), and the Court of Appeals for the Fourth Circuit has previously stated that the doctrine should be limited to circumstances in which a defendant has wrongfully acted to prevent a plaintiff from discovering the existence a cause of action, *English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir.1987).

Arguably, the decision of the Supreme Court in *Irwin* requires courts to broaden the range of factors that will be considered in deciding whether to grant equitable relief. *See Irwin,* 498 U.S. at 95–96, 111 S.Ct. at 457–58. However, there is no Supreme Court or Fourth Circuit precedent specifically addressing whether the mental incompetency of a plaintiff, resulting from no fault of the defendant, provides a basis for equitably tolling a federal limitations period. Those courts which have addressed this issue appear to be divided. *See Nunnally v. MacCausland,* 996 F.2d 1, 5 (1st Cir.1993) (concluding that mental incompetency may serve as a basis to equitably toll a federal statute of limitations under appropriate circumstances); *Llewellyn v. Celanese Corp.,* 693 F.Supp. 369, 379 (W.D.N.C.1988) (same); *Moody v. Bayliner Marine Corp.,* 664 F.Supp. 232, 235 (E.D.N.C.1987) (same). *But see Harris v.*

*Ford Motor Co.,* 635 F.Supp. 1472, 1474 (E.D.Mo.1986) (holding that mental disability not caused by the defendant will not equitably toll a federal statute of limitations); *Steward v. Holiday Inn, (sic) Inc.,* 609 F.Supp. 1468, 1469 (E.D.La.1985) (same). Moreover, those courts which have concluded that federal limitations periods may be equitably tolled on the ground of mental incompetency appear to disagree on the proper standard to be applied in determining whether a particular plaintiff's mental disability warrants tolling of a limitations period. *See Nunnally,* 996 F.2d at 5 (concluding that equitable relief should be "denied if the plaintiff was able to engage in rational thought and deliberate decision-making sufficient to pursue his claim alone or through counsel"); *Bassett v. Sterling Drug, Inc.,* 578 F.Supp. 1244, 1246–48 (S.D.Ohio 1984) (requiring that a plaintiff be adjudicated mentally incompetent or be institutionalized as a result of a diagnosed mental disability).

This court need not resolve either of these difficult issues because, applying the most lenient standards, the evidence viewed in the light most favorable to Mincey does not warrant tolling the limitations period through September 17, 1993—the date six months prior to the filing of Mincey's claim. In support of his contention that his mental incapacity warrants tolling of the limitations period, Mincey relies almost exclusively on the report of Dr. Morgan, his psychiatric expert. Dr. Morgan states in his report that:

> For a few days after seeing his friend die Mr. Mincey was in a state of emotional shock—technically called acute anxiety or, in diagnostic terms, an Adjustment Disorder. This was manifested by an excessive but unshakable fear that his life was in danger. This fear caused him to think and behave erratically. His decisions to quit his job on August 10, 1992, sell his house and leave town were signs of impaired reasoning and impulsive judgment caused by the unreasonable fear. With the capture of the killers this fear subsided and Mr. Mincey was able to think more rationally.

Dr. Morgan also notes that Mincey continues to suffer from mild depression and a general-

ized anxiety disorder but concludes that despite these continuing psychological problems Mincey "should be able to handle his responsibilities as a mail carrier as well as ever." In short, Dr. Morgan's report merely is evidence that for "a few days" Mincey was unable to think clearly.

Mincey did subsequently suffer acute depression which culminated in a suicide attempt on October 7, 1992. However, there is no evidence to suggest he had not recovered sufficiently to pursue his claim by the time of his discharge from the Veterans' Hospital on November 13, 1992. Indeed, the evidence is to the contrary. On November 23, 1992, Mincey filed for unemployment compensation. When his claim was initially denied, Mincey pursued the matter on appeal. At the same time, Mincey also reinitiated contact with Porth, attempting to convince him that the Union should file a grievance on his behalf. In a diary of events that Mincey prepared for Porth on August 6, 1993, Mincey even acknowledged that he believed the "case will eventually end up in litigation." Therefore, Mincey was clearly competent to pursue his wrongful discharge/fair representation · claim well before September 17, 1993—the date six months prior to when he filed this cause of action. Mincey's failure to exercise due diligence in filing this cause of action within the limitations period renders his claim untimely. Accordingly, the Defendants are entitled to summary judgment.

### 3) Elements of a Wrongful Discharge/Fair Representation Claim.

■ As an alternative basis for summary judgment, the Defendants argue that Mincey has failed to present evidence sufficient to create a genuine issue of material fact on either of the two elements of his claim. Specifically, they assert that Mincey has failed to identify any provision of the National Agreement that the Postal Service violated when it refused to reinstate him, and consequently, how the Union acted in a discriminatory, dishonest, arbitrary, or perfunctory manner when it refused to file a grievance challenging the denial of Mincey's request for reinstatement. With regard to the first element of his claim, Mincey responds with the asser-

tion that Cribb violated Article 15 of the National Agreement when she refused to accept a grievance directly from him. With regard to the second element, Mincey maintains that the Union had a duty to file a grievance on his behalf irrespective of whether the Union believed that the grievance lacked merit.

The Article 15 provisions governing the initiation of a Step 1 grievance provide in pertinent part:

a. Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or Union has learned or reasonably may have been expected to have learned of its cause. The employee may be accompanied by the steward or a Union representative, if the employee so desires.

b. If no resolution is reached as a result of such discussion, the supervisor shall render a decision orally stating the reasons for the decision.... Within five (5) days following the discussion of an unresolved grievance, a statement initiated by the grievant shall be signed by the grievant and supervisor signifying that the discussion constitutes the first step of the grievance procedure.

c. For other than disciplinary actions the Union may also initiate a grievance at Step 1 in accordance with the above, and may initiate a class grievance at Step 1 when the grievance concerns the complaint of more than one employee in the office. If the Union initiates a grievance, the steward or Union representative is the only party to meet with the appropriate supervisor.

Mincey contends that Cribb violated these provisions by indicating that she would not accept or sign any statement that he personally submitted as required in Step 1(b). The Postal Service maintains that Cribb was correct in stating that Mincey had to proceed through the Union because the grievance procedures only apply to "employees" of the Postal Service and Mincey was no longer an employee at the time he attempted to file a grievance.

Even if the court were to assume that Cribb violated the grievance procedures set forth in Article 15, it is questionable whether such a violation would suffice to establish the first element of Mincey's wrongful discharge/fair representation claim. Mincey does not allege that he requested the Union to file a grievance challenging the Postal Services' failure to accept a grievance from him, nor does he seek an order from this court requiring the Postal Service to process his grievance in accordance with the above quoted procedures. Rather, he prays for reinstatement with backpay. In essence, Mincey's complaint is that the Postal Service wrongfully refused to reinstate him and that the Union breached its duty of fair representation by failing to challenge that action. Proof that the Postal Service failed to comply with the grievance procedures set forth in the National Agreement, standing alone, would not appear to establish that Mincey was wrongfully discharged.

The court, however, need not resolve whether Cribb violated Article 15 or whether such a violation would establish the first element of Mincey's wrongful discharge/fair representation claim. Mincey has not presented any evidence supporting his contention that the Union had a duty to file a grievance it believed to be meritless, *see Amburgey v. Consolidation Coal Co.,* 923 F.2d 27, 30 (4th Cir.1991) (concluding that the UMW was not required to file a grievance it believed to be unwarranted), nor has he presented evidence to challenge the Union's conclusion that the Postal Service was not required to allow him to revoke his resignation. Mincey has not cited and the court has been unable to locate a provision in the National Agreement that would require the Postal Service to allow Mincey to withdraw his resignation. Title 5, part 715, § 202(b) of the Code of Federal Regulations, which Mincey also failed to cite, does require federal agencies to permit employees to withdraw resignations prior to their effective date unless the agency has a valid reason and explains that reason to the employee. However, it is clear from the undisputed facts that Mincey's resignation had become effective prior to the date he attempted to withdraw it. Therefore, 5 C.F.R. § 715.202(b) not only would not require the Postal Service to allow Mincey to withdraw his resignation, but it also would not require the Postal Service to give any reason for its refusal to do so. Consequently, Mincey has failed to establish a genuine issue of material fact as to whether the Union's actions were "grossly deficient" or "in reckless disregard" of his rights. *Id.* at 30. As a result, both the Postal Service and the Union are additionally entitled to summary judgment on the merits of Mincey's hybrid wrongful discharge/fair representation claim.

**THEREFORE, IT IS ORDERED** that the *Defendants'* motion for summary judgment be granted.

**IT IS SO ORDERED.**