CITY OF FOSTORIA, APPELLEE, *v.* OHIO PATROLMEN'S
BENEVOLENT ASSOCIATION ET AL., APPELLANTS.

[Cite as *Fostoria v. Ohio Patrolmen's Benevolent
Assn.,* 106 Ohio St.3d 194, 2005-Ohio-4558.]

(No. 2004–0892—Submitted March 9, 2005—Decided September 14, 2005.)

_____

O'DONNELL, J.

{¶ 1} The Ohio Patrolmen's Benevolent Association ("OPBA") and dispatcher Louanne Grine appeal from a decision of the Seneca County Court of Appeals affirming the trial court's decision to modify an arbitration award that reinstated three police dispatchers to the Fostoria Police Department. The history of the case reveals that on February 1, 2002, the police department laid off all three full-time members of its dispatchers unit in compliance with the city's mandate that each department reduce its budget by 20 percent to avoid an impending $1.5 million budget shortfall.[1] Because of those layoffs, police officers began to perform all dispatching duties.

{¶ 2} Grine, one of the three laid-off dispatchers, filed two grievances against the city in accordance with terms of the collective-bargaining agreement ("CBA") between the city and the OPBA. Grine asserted that patrol officers could not perform dispatch duties for more than four hours per shift pursuant to Section 2, Article 10 of the CBA, which reads:

{¶ 3} "In the event of a reduction in force from the police department due to lack of work or lack of funds, patrol officers may be assigned to dispatcher duties no more than four (4) hours per shift except in case of an emergency."

{¶ 4} Grine also protested her layoff. As a remedy, Grine requested that the city return all three dispatchers to work and reimburse them for any losses

_____

1. In addition to the three full-time dispatchers-unit employees, the police department also laid off two patrol officers and three part-time dispatchers. The part-time dispatchers were not members of the dispatchers unit and therefore were not entitled to file grievances with the OPBA. Those layoffs, however, are not at issue in this case.

sustained from the layoffs. Not being able to resolve this dispute, the parties submitted the issue of whether the city violated Section 2, Article 10 of the CBA to binding arbitration pursuant to Sections 3 and 4, Article 9 of the CBA.

{¶ 5} On August 30, 2002, the arbitrator ordered the city to reinstate all three dispatchers and to reimburse them for their losses. The arbitrator drew several conclusions: first, responding to the city's position that its fiscal crisis constituted an "emergency" under Section 2, Article 10 of the CBA, the arbitrator found that the parties had not expressed any intent to define "emergency" to include financial difficulties. After reviewing the operative language, the arbitrator declared, "Any reasonable interpretation of 'lack of funds' must include a fiscal crisis of the type" at issue here. The arbitrator decided that the CBA therefore specifically prohibited patrol officers from performing dispatcher duties for more than four hours per shift due to a fiscal emergency.

{¶ 6} In addition, although the city contended that the CBA permitted patrol officers to serve as dispatchers for 24 hours per day as long no individual patrol officer served for more than four hours per shift, the arbitrator found that patrol officers as a group could perform dispatcher duties for no more than four hours per shift in these circumstances. Thereafter, a dispatcher had to serve for the remaining hours of the shift.

{¶ 7} Finally, the arbitrator found that while the city's financial situation required a reduction in spending, "the decimation of the Dispatcher Bargaining Unit, under the pretext of saving money, is questionable," since patrol officers are generally paid more than dispatchers.

{¶ 8} On November 27, 2002, the city filed a motion in common pleas court to vacate and modify the arbitration award. Upon review, the trial court determined that the CBA did not contemplate "group grievances" and that the arbitrator had ruled on a matter not properly before him in extending the order to nongrieving dispatchers. Further, the court found that the CBA allowed the city to use police officers as dispatchers for four hours per shift, or 12 hours per day. Accordingly, the court held that the city could lay off at least one full-time dispatcher without violating the CBA, and it modified the award to apply only to Grine. On appeal, the court of appeals affirmed the judgment of the trial court, holding that the arbitrator had made an award on a matter that was not, and could not be, submitted under the CBA. The OPBA now appeals from that decision, and we have accepted the appeal for discretionary review.

{¶ 9} OPBA claims that the court of appeals erred in holding that a grievance signed by only one bargaining-unit member precludes the arbitration of that grievance on behalf of a group. OPBA further alleges that the court exceeded its scope of review in ruling on an issue that Fostoria had failed to present during

arbitration. The city insists that the CBA does not permit the arbitration of class grievances.

{¶ 10} The law with respect to the review of arbitration awards is well settled: "[A] reviewing court's role in evaluating an arbitrator's award is a limited one. The arbitrator's award will not be vacated so long as the award 'draws its essence from the collective bargaining agreement.' " *Queen City Lodge No. 69, Fraternal Order of Police, Hamilton Cty., Ohio, Inc. v. Cincinnati* (1992), 63 Ohio St.3d 403, 406, 588 N.E.2d 802, quoting *United Steelworkers of Am. v. Ent. Wheel & Car Corp.* (1960), 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424. Indeed, "[o]nce the arbitrator has made an award, that award will not be easily overturned or modified. It is only when the arbitrator has overstepped the bounds of his or her authority that a reviewing court will vacate or modify an award." Id. at 407, 588 N.E.2d 802.

{¶ 11} An arbitrator derives his authority from the express terms of the collective-bargaining agreement between the parties. *Ohio Office of Collective Bargaining v. Ohio Civil Serv. Emp. Assn., Local 11, AFSCME, AFL–CIO* (1991), 59 Ohio St.3d 177, 183, 572 N.E.2d 71. The city, however, never addressed the issue of whether the CBA permitted the parties to arbitrate a group or class grievance during the arbitration proceedings. Instead, the sole issue presented to the arbitrator concerned whether the city had violated the agreement by using patrol officers to perform the duties of all three dispatchers. Based on the unique facts of this case, this record demonstrates that the parties implicitly authorized the arbitrator to resolve this case as a class grievance.

{¶ 12} As this court has often noted, "[i]t is the well-settled rule that a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck* (1943), 142 Ohio St. 91, 92, 26 O.O. 280, 50 N.E.2d 145. See, also, *State ex rel. Johnson v. Ohio Adult Parole Auth.*, 95 Ohio St.3d 463, 2002-Ohio-2481, 768 N.E.2d 1176, ¶ 6. In *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196, this court held,

{¶ 13} "The law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted.

{¶ 14} "It follows therefore that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible." This rationale applies equally to arbitration proceedings.

{¶ 15} Here, the record demonstrates that the city never moved to separate individual cases or to dismiss any pending grievance; nor does the record reflect that the city at any time objected to the OPBA presenting Grine's grievances on behalf of all three dispatchers in one arbitration proceeding. Moreover, the city never asserted during the arbitration proceeding that the OPBA or Grine presented irrelevant evidence with respect to the other two dispatchers.

{¶ 16} A review of the record demonstrates that the parties treated this matter as a class grievance. For example, in the "Remedy Desired" section of the grievance forms, the relief sought was to "return dispatchers & make them whole for all los[t] wages and benefits." In addition, in a February 19, 2002 letter to Fostoria's Safety/Service Director about arbitration, Grine's counsel identified the issue twice as "grievance" of the "Dispatchers." Moreover, in a February 19, 2002 letter with the subject line "City of Fostoria and City of Fostoria *Dispatchers'* Grievances," the *parties jointly* requested the American Arbitration Association to provide a list of arbitrators to handle "the layoff and reduction in force of the *dispatchers.*" (Emphasis added.)

{¶ 17} The record further shows the arbitrator's intention and understanding to treat this matter as a class action. In an April 19, 2002 letter to the parties acknowledging that he had been selected to arbitrate the grievance, the arbitrator referred to the grievant as "Class" rather than "Grine." Additionally, in correspondence dated March 18, 2002, and April 19, 2002, the American Arbitration Association referred to the subject of the grievances as the "Layoff and Reduction in Force of *dispatchers.*" (Emphasis added.) Finally, the record illustrates that the parties treated this matter as a class grievance for the purposes of an unfair-labor-practice charge before the State Employment Relations Board.

{¶ 18} The nature of the grievances and the arbitration proceedings leads to the conclusion that the parties believed that the grievances at issue involved three dispatchers. At no time did the city ever make any motion to limit evidence or dismiss any claim; instead, only on appeal before the common pleas court did the issue regarding whether the CBA permitted the parties to arbitrate a class grievance arise. Because the city failed to present this issue to the arbitrator, the city has now waived its right to object to the scope of the arbitration.

{¶ 19} We need not, therefore, resolve the question of whether express authorization for group or class grievances must be included in a collective-bargaining agreement. The answer to that question may vary under the circumstances, but in most cases, express authorization for group grievances is required, as held by the court of appeals.

{¶ 20} The Sixth Circuit Court of Appeals has considered the question of whether a union member may file a grievance on behalf of other members when

the governing collective-bargaining agreement fails to address the issue. *Wilson v. Internatl. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO* (C.A.6, 1996), 83 F.3d 747. It held that in such a circumstance, a court should consider evidence extrinsic to the agreement to determine whether group filing of grievances was proper under the agreement. Id. at 752.

{¶ 21} In *Wilson,* evidence showed that group grievances had been allowed in the past under the collective-bargaining agreement but "only where the grievance was filed by a union steward, or where all members of the group personally signed the grievance." Id. The Sixth Circuit affirmed the trial court's decision that a grievance signed and filed by a single employee did not qualify as a group grievance. It found most persuasive the fact that none of the other members asserted to have been included within the claimed group grievance had signed the grievance and further noted that at least one such member "did not even know that a grievance had been filed until long after the grievance process had begun." Id.

{¶ 22} In 2003, however, a federal district court in Michigan affirmed an arbitrator's decision that a group grievance signed and filed by a union steward was proper. The arbitrator found that the collective-bargaining agreement provided authority to decide the dispute even though the agreement provided for the filing of written grievances by employees and no grievance was signed or filed by any member of the group. *Internatl. Bhd. of Teamsters, Gen. Teamsters Union Local 406 v. FiveCAP, Inc.* (W.D.Mich.2003), No. 1:02–CV–928, 2003 WL 22697173, *6. The arbitrator further concluded that a remedy could be awarded for all affected employees of the group. Id. See, also, *Penn–Delco School Dist. v. Penn–Delco Edn. Assn.* (Pa.Commw.2000), 754 A.2d 51, 55 (class grievance signed only by union president was arbitrable despite absence of signature of an aggrieved employee).

{¶ 23} In the case at bar, the OPBA negotiated a collective-bargaining agreement with Fostoria that recognized the association as the "sole and exclusive bargaining agent for all full-time dispatchers." The agreement included a grievance procedure to resolve disputes between the city and dispatchers and defined "grievance" to include "a complaint that Management has violated the terms of this Agreement."

{¶ 24} As the first step of the grievance process established by Section 3, Article 9 of the collective-bargaining agreement, "the grievant and representative" are required to discuss the matter with the grievant's immediate supervisor. Thereafter, if, as in the case at bar, the grievance concerns an issue that the supervisor "has no discretion or authority to resolve," the collective-bargaining agreement establishes that "the grievance *shall be* reduced to writing and

*presented* to the Chief [of Police] within seventy-two (72) hours of the supervisor's answer." (Emphasis added.)

{¶ 25} In using the passive voice to describe the preparation of a written grievance, the parties failed to clearly establish who it is that must present a written grievance to the chief of police. That is, the collective-bargaining agreement does not establish whether each employee potentially affected by a management decision must sign a written grievance, whether one employee may sign a grievance on behalf of a group or class, or whether an association representative may sign the grievance on behalf of the group of employees it represents.

{¶ 26} Although the arbitrator had not ruled on that issue, the trial court determined that the collective-bargaining agreement did not contemplate "group grievances." The court of appeals agreed, holding that an arbitrator may not afford a remedy for all members of a bargaining unit when the collective-bargaining agreement lacks specific language authorizing "group" or "class" grievances[2] and only one member signs a grievance.

{¶ 27} It is in the best interest of all parties to collective-bargaining agreements that express understanding is reached at the bargaining stage concerning the procedural requirements for the resolution of grievances. We therefore urge public employers and public-employee unions to specifically address the issues raised in this appeal when negotiating collective-bargaining agreements.

{¶ 28} In the final analysis, our decision today does not imply that courts may read terms and conditions into collective-bargaining agreements where none exist. Rather, we hold that an arbitrator derives authority from the terms of the collective-bargaining agreement. And, further, where the parties and the arbi-

---

2. {¶ a} A negotiated collective-bargaining agreement provision authorizing "class grievances" was quoted in *Dist. 1199, Health Care & Social Serv. Union, SEIU, AFL–CIO v. State Emp. Relations Bd.*, Franklin App. No. 02AP–391, 2003-Ohio-3436, 2003 WL 21499655, ¶ 7, as follows:

{¶ b} " 'When a group of bargaining unit employees desires to file a grievance involving an alleged violation that affects more than one (1) employee in the same way, the grievance may be filed by the union. A grievance so initiated shall be called a Class Grievance. Class Grievances shall be filed by the Union within fifteen (15) days of the date on which the grievant(s) knew or reasonably could have known of the event giving rise to the Class Grievance. Class Grievances shall be initiated directly at Step Two (2) of the grievance procedure if the entire class is under the jurisdiction * * * of more than one (1) Step Two (2) management representative. The Union shall identify the class involved, including the names if necessary, if requested by the agency head or designee.' "

{¶ c} Similarly, the following clause was quoted in *Mincey v. United States Postal Serv.* (D.C.S.C.1995), 879 F.Supp. 567, 574:

{¶ d} " 'c. For other than disciplinary actions the Union may also initiate a grievance at Step 1 in accordance with the above, and may initiate a class grievance at Step 1 when the grievance concerns the complaint of more than one employee in the office. If the Union initiates a grievance, the steward or Union representative is the only party to meet with the appropriate supervisor.' "

trator demonstrate an intent during the arbitration to resolve a group or class grievance, the failure on the part of a party to object to the scope of the arbitration constitutes a waiver of the right to contest that issue on appeal.

{¶ 29} Accordingly, the judgment is reversed, and the arbitration award is reinstated.

Judgment reversed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

---

Eugene P. Nevada, for appellee.

Allotta, Farley & Widman Co., L.P.A., Larry D. Farley, and Michelle T. Sullivan, for appellants.