OHIO GROCERS ASSOCIATION ET AL., APPELLEES, *v.* LEVIN,

TAX COMMR., APPELLANT.

[Cite as *Ohio Grocers Assn. v. Levin,* 123 Ohio St.3d 303, 2009-Ohio-4872.]

*Taxation — Commercial activity tax — R.C. 5751.02 et seq. — Commercial activity tax is not tax on sale or purchase of food and therefore does not violate Section 3(C) or 13, Article XII, Ohio Constitution — Commercial activity tax is tax on privilege of doing business — Fact that tax is measured by gross receipts that include proceeds from sale of food does not affect constitutionality of tax.*

(No. 2008-2018 — Submitted September 1, 2009 — Decided September 17, 2009.)

APPEAL from the Court of Appeals for Franklin County, No. 07AP-813, 178 Ohio App.3d 145, 2008-Ohio-4420.

_____

**O'CONNOR, J.**

{¶ 1} The Ohio Grocers Association and four individual businesses (collectively, "the Grocers") argue that the Commercial Activity Tax ("CAT") violates the constitutional prohibition against excise taxes levied upon the sale or purchase of food, whether at retail or wholesale. See Sections 3(C) and 13, Article XII, Ohio Constitution. The General Assembly imposed the CAT "on each person with taxable gross receipts for the privilege of doing business in this state," R.C. 5751.02(A), and it measured the value of that privilege using gross receipts, see R.C. 5751.03(A). The Grocers allege that to the degree that gross receipts include proceeds from the sale of food, the CAT is a prohibited tax upon the sale of food. The Tenth District Court of Appeals agreed.

**{¶ 2}** For the following reasons, we hold that the CAT is not an excise tax "upon the sale or purchase of food" and does not violate the Ohio Constitution. Therefore, we reverse the judgment of the court of appeals.

### Relevant Background

**{¶ 3}** The Ohio Constitution permits laws providing for"[e]xcise and franchise taxes * * * except that no excise tax shall be levied or collected upon the sale or purchase of food for human consumption off the premises where sold." Section 3(C), Article XII, Ohio Constitution.[1]

**{¶ 4}** A similar provision, Section 13, Article XII, prohibits the taxation of food (or food-related) sales at other points on the distribution chain:

**{¶ 5}** "No sales or other excise taxes shall be levied or collected (1) upon any wholesale sale or wholesale purchase of food for human consumption, its ingredients or its packaging; (2) upon any sale or purchase of such items sold to or purchased by a manufacturer, processor, packager, distributor or reseller of food for human consumption, or its ingredients, for use in its trade or business; or (3) in any retail transaction, on any packaging that contains food for human consumption on or off the premises where sold."

**{¶ 6}** The CAT was phased in beginning in 2005. Am.Sub.H.B. No. 66, 126th General Assembly. The Grocers acknowledge that the tax is "one of the key components" of "a series of tax revisions generally designed to lessen the burden of taxation on Ohio's businesses." For many businesses, the CAT replaces the tax on personal property located and used in business in Ohio, see R.C. Chapter 5719, and it replaces the tax on the privilege of exercising the corporate franchise in this state. See R.C. 5733.01(G)(1) and (2) (phasing out the

---

1. For brevity's sake, any unqualified reference to "the sale or purchase of food" in this opinion means only such sales "for human consumption off the premises where sold."

corporate franchise tax); R.C. 5711.22(E) through (G) (phasing out the personal property tax); R.C. 5751.031 (phasing in the CAT).

{¶ 7} The CAT is levied "on each person with taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A). Businesses grossing less than $150,000 in a calendar year need not register for or pay the tax. R.C. 5751.01(E)(1). Persons receiving between $150,000 and $1 million in gross receipts pay a flat $150 tax. R.C. 5751.03(B). For gross receipts over $1 million, the tax is "the product of two and six-tenths mills [0.0026] per dollar times the remainder of the taxpayer's taxable gross receipts." R.C. 5751.03(A). Gross receipts includes amounts received from sales, R.C. 5751.01(F)(1)(a), and there is no exclusion for sales of food.

{¶ 8} On February 17, 2006, the Grocers filed a complaint against the tax commissioner in the Franklin County Court of Common Pleas seeking a declaration that the CAT "violates the Ohio Constitution * * * when applied to receipts from the sale of food for human consumption off the premises where sold." On cross-motions for summary judgment, the common pleas court upheld the CAT. See *Ohio Grocers Assn. v. Wilkins* (Aug. 24, 2007), Franklin C.P. No. O6CVH02-2278.

{¶ 9} The court of appeals reversed and remanded. In so doing, it held that "a franchise tax is a form of an excise tax" and that "excise taxes on certain food sales are precisely what the Constitution prohibits." *Ohio Grocers Assn. v. Wilkins*, 178 Ohio App.3d 145, 2008-Ohio-4420, 897 N.E.2d 188, ¶ 20. "[S]etting nomenclature aside," the appellate court ruled that "when applied to gross receipts derived from the sales of food," the CAT is "a transactional tax." Id. at ¶ 21. "[T]hough not based on individual sales at the time they are made," the court reasoned, "the CAT is merely based on the aggregate of all sales within a specified time frame." Id. The court concluded that the CAT, "when applied to gross receipts from the * * * sale of food * * *, operates as, and is, an excise tax

levied or collected upon the sale or purchase of food, which is prohibited by Sections 3 and 13 of Article XII of the Ohio Constitution." Id. at ¶ 27.

{¶ 10} The tax commissioner appealed to this court, and we accepted jurisdiction to resolve whether the CAT violates Sections 3(C) and 13 when applied to persons whose gross receipts include proceeds from the sale of food. We hold that it does not.

### Analysis

{¶ 11} Before analyzing the merits of this case, we note that parties, including the Grocers, who challenge the constitutionality of an Ohio statute, bear a heavy burden of persuasion. "Laws are entitled to a 'strong presumption of constitutionality,' and the party challenging the constitutionality of a law 'bears the burden of proving that the law is unconstitutional beyond a reasonable doubt.' " *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 41, quoting *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. Moreover, the constitutional provisions that the Grocers rely on to invalidate the CAT are tax exemptions and therefore must be strictly construed. See *Welfare Fedn. of Cleveland v. Glander* (1945), 146 Ohio St. 146, 177, 32 O.O. 65, 64 N.E.2d 813 ("strict construction is to be applied" to "constitutional and statutory provisions for exemption from taxation"). These precepts require us to uphold the CAT if it may plausibly be interpreted as permissible under Sections 3(C) and 13.

*The Constitution Permits Privilege-of-Doing-Business Taxes Measured by Gross Receipts that Include Proceeds from the Sale of Food*

{¶ 12} Section 3(C), Article XII prohibits any excise tax "levied or collected upon the sale or purchase of food." Similarly, Section 13 prohibits "sales or other excise taxes" upon food sales at other points in the distribution chain, such as wholesale sales. It is well accepted that taken together, these

sections prohibit a sales tax on food, and indeed, sales of food remain exempt from the sales tax. R.C. 5739.02(B)(2).

{¶ 13} The Grocers, however, assert that Sections 3(C) and 13 do more— namely, prohibit a tax on the privilege of doing business to the degree that the privilege is measured by gross receipts derived from food sales. The court of appeals agreed with this interpretation of these sections.

{¶ 14} That interpretation is not, however, the best reading of the sections. The actual wording of Sections 3(C) and 13 does not prohibit the state from using gross receipts to compute the amount of a privilege-of-doing-business tax, even if those gross receipts include proceeds from the sale of food. And as will be discussed, interpreting Sections 3(C) and 13 to allow such a tax is not only faithful to the text, it is (1) consonant with long-settled legal principles governing the taxation of the privilege of doing business, (2) implied by the structure of Sections 3(C) and 13, and (3) confirmed by the history both preceding and succeeding the enactment of those provisions. And when the CAT's practical operation is considered, it becomes evident that it is what it purports to be: a permissible tax on the privilege of doing business, not a proscribed tax upon the sale or purchase of food. For these reasons, we reverse the judgment of the court of appeals.

*Applicable Principles*

{¶ 15} Our decisions establish three fundamental principles that govern our analysis.

{¶ 16} First, it is permissible to tax the privilege of doing business, and to do so, the privilege must be valued. The privilege of doing business, often called a franchise, is valuable and subject to taxation by the state. *S. Gum Co. v. Laylin* (1902), 66 Ohio St. 578, 595, 64 N.E. 564. It follows that to impose a tax on a privilege, the privilege must be valued. Thus, in a case arising under the corporate franchise tax, we acknowledged that the General Assembly may

"determine by uniform rules and as nearly as may be the value of the use of the corporate franchise in this state." (Emphasis deleted.) *Aluminum Co. of Am. v. Evatt* (1942), 140 Ohio St. 385, 394, 24 O.O. 405, 45 N.E.2d 118. The value of the privilege may be determined using gross receipts, among other measures. Indeed, where the General Assembly, in levying a tax on the privilege of conducting a public-utility business, chose to use "gross earnings" to measure the value of the privilege as opposed to net earnings, we characterized that choice as wise. *Cincinnati, Milford & Loveland Traction Co. v. State* (1916), 94 Ohio St. 24, 31, 113 N.E. 654; see also, e.g., *State ex rel. Cleveland v. Kosydar* (1973), 36 Ohio St.2d 183, 184, 65 O.O.2d 401, 305 N.E.2d 803; *W. Union Tel. Co. v. Mayer* (1876), 28 Ohio St. 521, 1876 WL 27; see also *In re State Tax on Ry. Gross Receipts* (1872), 82 U.S. 284, 15 Wall. 284, 296, 21 L.Ed. 164 ("nor is it deniable that gross receipts may be a measure of proximate value" of a business privilege).

{¶ 17} Second, in this context, we have long recognized a distinction between a tax *upon* a certain factor and a tax upon a privilege *measured by* that factor. E.g., *Aluminum Co. of Am.* As might be expected, the use of a factor to measure a tax on a privilege has raised the issue of whether a tax upon a privilege *measured by* a factor is the same as a tax *upon* that factor. But as we explained in *Aluminum Co. of Am.*, "it must be kept crystal clear that the only purpose of the [franchise-tax] formula * * * is to determine by uniform rules * * * the value of the use of the corporate franchise in this state." (Emphasis deleted.) 140 Ohio St. at 394, 24 O.O. 405, 45 N.E.2d 118. "The employment of various factors * * * *is no indication that the subjects of such factors are being taxed*. Instead, they are being used merely to compose a measuring stick." (Emphasis added.) Id.

{¶ 18} Early on, for example, this "measuring stick" principle was applied to uphold the corporate franchise tax against a constitutional challenge. In *S. Gum*, 66 Ohio St. at 596, 64 N.E. 564, the taxpayer argued that measuring the value of the franchise as a percentage of its capital stock is a second tax, the first

being the property tax, on the same property or capital, and that "thereby double taxation results." But this is not true, we held, because the tax was "not a property tax on property owned by the corporation, but is an excise tax, the amount of which is fixed and measured by the amount of subscribed or issued and outstanding capital stock." Id.

{¶ 19} This principle remains good law. See, e.g., *Mut. Holding Co. v. Limbach* (1994), 71 Ohio St.3d 59, 60, 641 N.E.2d 1080 ("R.C. 5725.18 is a franchise tax measured by net worth, not a tax on net worth"); *Bank One Dayton, N.A. v. Limbach* (1990), 50 Ohio St.3d 163, 167, 553 N.E.2d 624; *E. Ohio Gas Co. v. Limbach* (1986), 26 Ohio St.3d 63, 67, 26 OBR 54, 498 N.E.2d 453; *Wheeling Steel Corp. v. Porterfield* (1970), 21 Ohio St.2d 57, 60-61, 50 O.O.2d 135, 255 N.E.2d 257; *Fifth Third Union Trust Co. v. Peck* (1954), 161 Ohio St. 169, 172, 53 O.O. 75, 118 N.E.2d 398.

{¶ 20} Third, as implied by the foregoing, the measuring stick of a privilege-of-doing-business tax may include tax-exempt factors. Thus, we have upheld the corporate franchise tax against allegations that it was a tax on tax-exempt factors in disguise. *Bank One*, 50 Ohio St.3d at 164, 553 N.E.2d 624. In *Bank One*, it was argued that the franchise tax, measured in part by tax-exempt federal stocks and obligations, violated federal statutory law and thus the Supremacy Clause of the United States Constitution. We rejected the argument, noting that "a franchise tax may be *measured by tax-exempt income or property* and still be a valid tax on the franchise and not on the property." (Emphasis sic.) Id. at 167, 553 N.E.2d 624.

{¶ 21} Likewise, in *Fifth Third Union Trust*, we held that the franchise-tax base could include federal securities that were exempt by federal law from taxation by the states. 161 Ohio St. at 172, 53 O.O. 75, 118 N.E.2d 398. This was because the tax levied "is a franchise tax based on the value of the capital

stock and is not a tax on the securities as such."[2]  Id.; see also, e.g., *Werner Mach. Co. v. Dir., New Jersey Div. of Taxation* (1956), 350 U.S. 492, 494, 76 S.Ct. 534, 100 L.Ed. 634 ("This Court has consistently upheld franchise taxes measured by a yardstick which includes tax-exempt income or property, even though a part of the economic impact of the tax may be said to bear indirectly upon such income or property * * *").

*Applying these Principles, Sections 3(C) and 13 Permit a*

*Privilege-of-Doing-Business Tax Measured by Gross Receipts that*

*Include Proceeds from the Sale of Food*

{¶ 22} With these governing principles in mind, *at a minimum* it is plausible to read Sections 3(C) and 13 as permitting the imposition of a privilege-of-doing-business tax on a food seller and measuring that tax by gross receipts including proceeds from the sale of food.  In essence, both sections prohibit taxes levied or collected upon the sale or purchase of food.  These provisions plainly prohibit a tax (such as the sales tax) that is triggered by and imposed upon each "sale" of food—whatever the tax is called.  But given that we must strictly construe these clauses, *Welfare Fedn. of Cleveland*, 146 Ohio St. at 177, 32 O.O. 65, 64 N.E.2d 813, we note that they do *not* prohibit a tax upon *sellers* of food. Nor do they prohibit the consideration of receipts from food sales in measuring the value of the privilege of doing business.

{¶ 23} As we have explained, our decisions have made clear that a tax "measured by" some factor is not the same as a tax "upon" that factor.  Those decisions further undermine the Grocers' expansive reading.  In short, Sections 3(C) and 13 do not prohibit a privilege-of-doing-business tax on food sellers, even

2.  Bearing out the strength of this principle, our 1952 decision to the contrary survived little more than two years.  See *Wren Paper Co. v. Glander* (1952), 156 Ohio St. 583, 46 O.O. 479, 103 N.E.2d 756, paragraph two of the syllabus (it is illegal to include tax-exempt federal securities in the franchise-tax base), overruled by *Fifth Third Union Trust Co. v. Peck* (1954), 161 Ohio St. 169, 53 O.O. 75, 118 N.E.2d 398, paragraph three of the syllabus.

if that privilege is measured by gross receipts that include proceeds from the sale of food.

{¶ 24} The Grocers, *at best*, urge a competing plausible reading. But plausibility is insufficient to prevail, because the Grocers must prove the CAT's unconstitutionality beyond a reasonable doubt. Thus, it is not enough to show that one plausible reading requires the statute to be stricken as unconstitutional, when another plausible reading permits it to survive. Similarly, the Grocers have not succeeded in showing that considering receipts from food sales in measuring the value of the privilege of doing business is prohibited. Thus, the statute must be upheld.

{¶ 25} But we need not rest on the standard of review. The structure and the history of these constitutional provisions clearly show that our interpretation is not only plausible, but that it is the correct reading of the provisions.

*The Language of Sections 3(C) and 13*

{¶ 26} The wording of Sections 3(C) and 13, in different ways, suggests that they were not intended to limit taxes upon the privilege of doing business. We consider each provision in order.

{¶ 27} Section 3, Article XII authorizes the General Assembly to pass laws providing for certain taxes. Among those taxes are "*[e]xcise and franchise taxes* and * * * taxes upon the production of coal, oil, gas, and other minerals; except that no *excise tax* shall be levied or collected upon the sale or purchase of food for human consumption off the premises where sold." (Emphasis added.) Section 3(C).

{¶ 28} As pertinent here, Section 3(C) grants two kinds of taxing power but takes away from only one. The first part of the section authorizes "excise and franchise taxes." An exception follows, but pertains only to excise taxes. This suggests that franchise taxes are not limited by Section 3(C). Although for many years the franchise tax per se was charged only to corporations, a "franchise tax"

has been understood for more than a hundred years to be a tax on the privilege of doing business. See, e.g., *S. Gum*, 66 Ohio St. 578, 64 N.E. 564, paragraph five of the syllabus ("[a] franchise tax may be imposed by the general assembly upon corporations, both domestic and foreign, doing business in this state"); cf. Black's Law Dictionary (9th Ed.2009) (defining "franchise tax" as "[a] tax imposed on the privilege of carrying on a business"). Thus, by permitting franchise *and* excise taxes but limiting *only* excise taxes, Section 3(C) implies that taxes on the privilege of doing business are not subject to its food-sales limitations.

{¶ 29} Likewise, the wording of Section 13 implies that it does not address or limit privilege-of-doing-business taxes. It is structured to prohibit "sales or other excise taxes" on food. A specific tax is listed first (sales tax), followed by a broader term ("or other excise taxes"). Under the rule of ejusdem generis, the latter term will be read as " 'embracing only things of a similar character as those comprehended by the preceding limited and confined terms.' " *Moulton Gas Serv., Inc. v. Zaino*, 97 Ohio St.3d 48, 2002-Ohio-5309, 776 N.E.2d 72, ¶ 14, quoting *State v. Aspell* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226, paragraph two of the syllabus. Thus, Section 13's wording suggests that only those excise taxes *that resemble* sales taxes fall under its prohibition—and a privilege-of-doing-business tax is not like a sales tax. If the drafters had desired to outlaw excise taxes of every stripe, they simply could have prohibited "excise taxes." This choice of language further suggests that Section 13 is not concerned with taxes upon the privilege of doing business.

{¶ 30} The Grocers' counterarguments on this point are unavailing. For example, it is true that a franchise tax *is* a kind of excise tax. But although Sections 3(C) and 13 use the term "excise," it does not follow that they are concerned with privilege-of-doing-business taxes. An excise tax cannot operate unless made to fall upon a specified subject. See, e.g., *Calerdine v. Freiberg* (1935), 129 Ohio St. 453, 457, 2 O.O. 437, 195 N.E. 854, quoting 26 Ruling Case

Law 257 (" '[i]t is for the legislature to determine the subjects of excise' "). The only excise tax prohibited by either section is upon sales of food or certain food-related items—not upon the privilege of doing business. And as just discussed, the wording of each provision rules out a broad reading of "excise" to encompass taxes that are like franchise taxes.

{¶ 31} The Grocers also point out that Section 3(C) once had a different structure: the clause prohibiting excise taxation of food sales was adopted in 1936 as Section 12, Article XII, whereas Section 10 contained the clause authorizing "excise and franchise taxes." In 1976, Sections 10 and 12 were combined to form Section 3(C). According to the Grocers, then, "there is simply no basis to conclude that the use of the term 'excise taxes' in the prohibiting clause of Section 3(C) was intended to exclude 'franchise taxes' from its scope." We disagree. The Grocers seem to assume that these provisions were merged by accident, but, of course, they were not. The fact that Ohioans chose to merge these sections and leave intact the distinction between "excise and franchise taxes," if anything, strengthens the inference that privilege-of-doing-business taxes are not intended to be subject to Section 3(C)'s food-sale limitations. If the drafters had wanted to eliminate the inference that excise taxes and franchise taxes were distinct, they would have eliminated the words "and franchise" from Section 3(C).

{¶ 32} In sum, the structure of Sections 3(C) and 13 reinforces our reading that these provisions do not apply to taxes upon the privilege of doing business.

*The History of Sections 3(C) and 13*

{¶ 33} The history surrounding Sections 3(C) and 13 shows that they have never been understood to prevent a privilege-of-doing-business tax from including in its measure proceeds from the sale of food.

{¶ 34} History reveals that Sections 3(C) and 13 were concerned with sales taxes on food, not privilege-of-doing-business taxes on food sellers. The Grocers concede that the prohibition now found in Section 3(C) was adopted in response to the application of the sales tax to food sales in the midst of the Great Depression. Parties for and against the adoption of that section considered it a "repeal of the sales tax on food," according to the certified ballot language proposing Section 12, Article XII at the November 3, 1936 election. After that section was adopted, the legislature amended the sales tax to make it inapplicable to sales of food. H.B. No. 694, 116 Ohio Laws, Part II, 323, 326, effective Jan. 1, 1937, now codified at R.C. 5739.02(B)(2).

{¶ 35} Likewise, Section 13 was adopted in response to a tax on the sale of food at wholesale. See *Cameron Coca-Cola Bottling Co. v. Tracy* (July 28, 1993), Franklin C.P. No. 93CVH02-729. In 1993, an Ohio court held that the imposition of a beverage tax on soft drinks at wholesale did not violate Section 3(C). See id. at 27. Soon after, Ohioans amended the Constitution to prohibit, among other things, any tax "upon any wholesale sale or wholesale purchase of food." Section 13, Article XII, Ohio Constitution. After Section 13 was adopted, the beverage tax was repealed by Am.Sub.H.B. No. 215, Section 6(A), 147 Ohio Laws, Part I, 1918, which was effective January 1, 1999.

{¶ 36} The history and application of these provisions confirm our interpretation. Without challenge, food sellers have been subject to a tax (the corporate franchise tax) upon the privilege of doing business that included proceeds from the sale of food in its measure for almost 40 years.

{¶ 37} The corporate franchise tax is, as the CAT purports to be, a tax on the privilege of doing business. It was first imposed over 100 years ago, and in 1971, the net-income method for measuring it was introduced. Former R.C. 5733.05, Am.Sub.H.B. No. 475, 134 Ohio Laws, Part II, 1558; see *Lakengren, Inc. v. Kosydar* (1975), 44 Ohio St.2d 199, 73 O.O.2d 502, 339 N.E.2d 814.

12

Since then, in theory, and usually in practice, food sales in Ohio have increased the burden of the corporate franchise tax on food sellers because such sales (1) determined the amount of income that formed part of the tax base and (2) determined the amount of income apportionable to Ohio.[3]  Food sellers, then, have long been subject to a privilege-of-doing-business tax measured in part by food sales.

**{¶ 38}** As just discussed, Ohioans energetically responded to food-related taxes in the past, but the Constitution was never amended to prohibit the franchise tax on food sellers, *even though since 1971 its measuring stick has substantially included food sales*.  And this is true though the constitutional provisions at issue have been amended twice since the net-income method was introduced.  The franchise tax was not at issue or affected by either amendment.  Significantly, only five years after the net-income method was introduced, Ohioans merged Section 10's authorization of "excise and franchise taxes" with Section 12's prohibition of "excise" taxation on food sales, which resulted in the very structure that strongly implies that privilege-of-doing-business taxes are *not* subject to any food-sale limitation.

**{¶ 39}** This history demonstrates that when a tax related to food crosses the line, Ohioans amend the Constitution.  But those amendments never have been read to prohibit the inclusion of food-sale proceeds in the measurement of a privilege-of-doing-business tax.  The Grocers offer no compelling reason to begin reading them this way now.

**{¶ 40}** In sum, the constitutional text, structure, and history fully establish that Sections 3(C) and 13 permit a tax upon the privilege of doing business that includes in its measure proceeds from the sale of food.  This leaves one issue: is

---

3. This principle has always been true, although we note that the precise statutory mechanism for measuring and apportioning the components has been altered over the years.  Compare Am.Sub.H.B. No. 475, 134 Ohio Laws, Part II, 1558–1565, with Am.Sub.H.B. No. 95, 150 Ohio Laws, Part II, 1931–1941; current versions codified at R.C. 5733.04(Q) and 5733.05(B)(2).

the CAT what it purports to be—a tax on the privilege of doing business? Or is it what it purports not to be—a tax on sales?

*Substantively, the CAT Is a Tax on the Privilege of Doing Business*

{¶ 41} The Grocers concede that the CAT is nominally a tax upon the privilege of doing business but assert that "substantively" it is "a tax on the sale or purchase of food, and suffers from the very same evils as the sales taxes" that prompted Sections 3(C) and 13. We disagree. When the operation of the CAT is considered, one can only conclude that it is not a tax upon the sale or purchase of food.

{¶ 42} When confronted with a challenge to the true nature of a tax, we look to how it operates. *Bank One*, 50 Ohio St.3d at 166, 553 N.E.2d 624; see also *Soc. for Sav. in Cleveland, Ohio v. Bowers* (1955), 349 U.S. 143, 151, 75 S.Ct. 607, 99 L.Ed. 950 ("We must judge the true nature of this tax in terms of the rights and liabilities which the statute, as construed, creates").

*The CAT Operates Like a Tax upon the Privilege of Doing Business*

{¶ 43} The CAT operates like a privilege-of-doing-business tax, as shown by the factors that follow.

{¶ 44} First, it is described as such by the legislature. R.C. 5751.02(A) ("there is hereby levied a commercial activity tax * * * for the privilege of doing business in this state").

{¶ 45} Second, it is imposed on the person enjoying the privilege. R.C. 5751.02(A) (tax is levied "on each person with taxable gross receipts").

{¶ 46} Third, it expressly "shall not be billed or invoiced" to a person other than the privilege holder, and no right of collection from any other person is created. R.C. 5751.02(B). See also *Soc. for Sav.*, 349 U.S. at 151, 75 S.Ct. 607, 99 L.Ed 950 ("A tax * * * which is recoverable only from the bank looks like a tax against the bank"). Like other costs of doing business, however, a seller may

"includ[e] in the price charged for a good or service an amount sufficient to recover the tax." R.C. 5751.02(B).

**{¶ 47}** Fourth, it is imposed for the exercise of the privilege for any portion of a calendar year. R.C. 5751.02(A) ("The tax imposed by this section is an annual privilege tax * * *"); see also *Bank One*, 50 Ohio St.3d at 166, 553 N.E.2d 624, quoting *E. Ohio Gas*, 26 Ohio St.3d at 67, 26 OBR 54, 498 N.E.2d 453 (franchise tax was " 'based upon the results of an entire year of doing business' ").

**{¶ 48}** Fifth, it is calculated based on results over certain business periods (either annually or quarterly), not transaction-by-transaction. R.C. 5751.02(A); see also *E. Ohio Gas*, 26 Ohio St.3d at 66–67, 26 OBR 54, 498 N.E.2d 453 (noting that privilege-of-doing-business tax was "based upon the results of an entire year of doing business" and was "not a tax on daily transactions").

**{¶ 49}** Sixth, it is computed using a broad measure of market access that is rationally related to the enjoyment of the privilege of doing business. R.C. 5751.03(A) (tax is the product of "taxpayer's taxable gross receipts [after subtracting the exclusion amount in R.C. 5751.03(C)]" times .0026). See also *Cincinnati, Milford & Loveland Traction Co.*, 94 Ohio St. at 31, 113 N.E. 654 (approving use of gross earnings in measuring franchise tax); *In re State Tax on Ry. Gross Receipts*, 82 U.S. at 296, 15 Wall. 284, 21 L.Ed. 164 ("nor is it deniable that gross receipts may be a measure of proximate value" of "a franchise granted").

**{¶ 50}** All of these features are consistent with a privilege-of-doing-business tax. The Grocers nevertheless insist that the CAT is a tax on the sale or purchase of food because it "has the effect of being a tax on food sales." This is not so.

*The CAT Does Not Operate Like a Tax upon the Sale or Purchase of Food*

{¶ 51} A tax that is neither triggered by a sale of food nor necessarily reflected in the price of food does not look like a tax upon the sale or purchase of food. This description fits the CAT in its practical operation.

{¶ 52} When there is a sale of food, the customer pays the price marked for the item. At the register, no tax is added to that price: sales tax cannot be added, because of Section 3(C); the CAT cannot be added, because of R.C. 5751.02(B). Nor does the seller incur liability under the CAT at that time. If the seller does not take in enough gross receipts in that year (over $150,000), there will be no CAT liability, period. R.C. 5751.01(E)(1). In that case, the sale, as far as the CAT is concerned, is tax free. A sale of food occurred; CAT liability did not. A tax that is neither triggered by nor imposed on a sale of food does not look like a tax upon the sale or purchase of food.

{¶ 53} But what if the seller does take in more gross receipts than $150,000, triggering CAT liability? Even then the CAT does not work like a tax upon the sale or purchase of food. To begin with, the price of food might never reflect a cent of the CAT. For up to $1 million in gross receipts, the CAT is a flat $150. R.C. 5751.03(B). So, if a grocer earns $1 million, it owes fifteen thousandths of a cent per dollar, evenly allocated. It is far from clear that such a small tax would have any impact on prices.

{¶ 54} And even with greater CAT liability, the cost of the tax might never cause grocers to increase the price of food. As recognized by the Grocers' own expert, the seller might respond to the cost of the CAT by cutting wages or taking lower profits. Or, having considered relative levels of demand, the seller could opt to build a disproportionate amount of the CAT's cost into the price of nonfood articles to keep food prices low (e.g., increase the price of paper towels by .52 percent to avoid increasing the price of eggs by .26 percent).

{¶ 55} Furthermore, even if some food prices reflect an increase related to the CAT, the relationship between the amount of the tax and any particular "sale

or purchase of food" would likely remain extremely attenuated. Many of the Grocers are sophisticated business enterprises. It seems doubtful that they would recoup the CAT by simply multiplying the price of every item for sale by 1.0026. One would expect that if a seller did include a CAT component in its prices, the component would reflect the seller's *projections* of CAT liability—made at the time prices were set (and thus before the sale), that would derive from both food and nonfood receipts. The seller would also have to consider what price the market would bear. If we consider the effect of the CAT's various credits, see R.C. 5751.50 through 5751.53, the relationship between the CAT and food sales appears even more remote.

{¶ 56} The point is that the relationship between a sale of food and CAT obligations is so attenuated and unpredictable that it simply cannot be said that the CAT operates as a tax upon the sale or purchase of food. It is clear that the tax falls on food sellers, among others. It is far from clear, however, that it falls upon the sale or purchase of food. It does not do so formally, nor must it do so practically. The notion that the CAT "operates" as a sales tax—which is collected from purchasers, imposed at the point of sale, and computed by multiplying the sale price by the applicable rate—is factually incorrect.

### Conclusion

{¶ 57} For the foregoing reasons, we reverse the judgment of the court of appeals and remand this case for further proceedings consistent with this opinion.

Judgment reversed.

MOYER, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

17

{¶ 58} Section 3(C), Article XII of the Ohio Constitution states, that laws may be passed providing for "[e]xcise and franchise taxes * * *; except that no excise tax shall be levied or collected upon the sale or purchase of food for human consumption off the premises where sold." It is uncontroverted that the Commercial Activities Tax ("CAT") at issue in this case is an excise tax. The Attorney General conceded the point at oral argument and wrote, in the tax commissioner's brief, that "excise tax is an umbrella term that encompasses both sales and franchise taxes." Thus, the issue before us can be simply stated: is the CAT "levied or collected upon the sale or purchase of food for human consumption off the premises where sold"? If it is, the CAT is unconstitutional; if it is not, the CAT is constitutional.

{¶ 59} Once sales crest $1 million, assuming that all credits and other allowances have been offset or otherwise adjusted, every additional dollar of sales for "food for human consumption off the premises where sold" subjects the retailer to an additional tax of .26 cents. R.C. 5751.03. It is an incontrovertible fact that if a retailer has sales over $1 million and he sells an additional 40 gallons of milk at $2.50 per gallon, for a total of $100, a tax of 26 cents is levied upon him and the state collects 26 cents. Is this not a tax "levied or collected upon the sale or purchase of food"?

{¶ 60} The fact that 26 cents per $100 is a small sum does not mean that this tax is de minimis, as the majority suggests as to the $150 flat fee. Though there are more than 11 million Ohio residents, assume that only ten million people actually live in Ohio. Further assume that they each consume exactly one gallon of milk per month, that milk costs $2.50 per gallon, and that all of the milk is purchased from a retailer with sales in excess of $1 million – that is, any milk purchased from Kroger, UDF, Giant Eagle, Meijer, Target, Whole Foods, Sam's Club, Costco, and the like. The excise tax levied and collected by the state based

18

on the sale of ten million gallons of milk would be $65,000. Would this not be a tax "levied or collected upon the sale or purchase of food"?

{¶ 61} The majority opinion concludes that sales are not being taxed, they are " 'merely' " being used as a " 'measuring stick,' " majority opinion at ¶ 17, quoting *Aluminum Co. of Am. v. Evatt* (1942), 140 Ohio St. 385, 394, 24 O.O. 405, 45 N.E.2d 118. But the quote in the majority opinion omits an important distinction between this case and *Aluminum Co.* The passage quoted by the majority goes on to state, "The employment of various factors in determining the part of the business of a corporation (whether domestic or foreign) done in Ohio is no indication that the subjects of such factors are being taxed. Instead, they are being used merely to compose a measuring stick." Id. The full quote and preceding text reveal that sales were used in *Aluminum Co.* as part of a complicated formula, which included the value of stock, the value of property owned in Ohio and outside Ohio, and sales in Ohio and outside Ohio. In *Aluminum Co.*, sales were not used to directly determine the tax owed but were truly a mere factor in determining the franchise tax. In this case, sales are the only measure. Furthermore, *Aluminum Co.* did not involve a subject that was constitutionally excluded from taxation by an excise tax.

{¶ 62} The majority opinion, citing *Bank One Dayton, N.A. v. Limbach* (1990), 50 Ohio St.3d 163, 167, 553 N.E.2d 624, quotes this court as stating that "a franchise tax may be *measured by tax-exempt income or property* and still be a valid tax on the franchise and not on the property." (Emphasis sic.) In *Bank One*, this court was quoting a United States Supreme Court case in which tax-exempt bonds were used as part of the net-worth valuation for computing New Jersey franchise tax. See *Educational Films Corp. of Am. v. Ward* (1931), 282 U.S. 379, 388, 51 S.Ct. 170, 75 L.Ed. 400. The relevance of that quote to this case is at best uncertain, but more likely, nonexistent.

{¶ 63} The majority opinion cites *Fifth Third Union Trust Co. v. Peck* (1954), 161 Ohio St. 169, 172, 53 O.O. 75, 118 N.E.2d 398, as holding that "the franchise-tax base could include federal securities that were exempt by federal law from taxation by the states." The quote is a fair characterization of the holding in *Fifth Third Union Trust,* but it is not relevant to the issue before us. The crux of *Fifth Third Union Trust* is that the franchise tax can be calculated based on " 'the value of the issued and outstanding shares of stock' * * * without deduction therefrom of the value of any federal securities owned by such corporation." Id. at paragraph three of the syllabus, quoting G.C. 5498. As a practical matter, tax-exempt bonds are exempt only from certain kinds of taxation. For instance, the interest earned on tax-exempt bonds is exempt from income tax, but capital gains on tax-exempt bonds are not exempt from taxation. Furthermore, the value of the bonds is separate and distinct from their tax-exempt status. And, of course, the *Fifth Third Union Trust* case did not involve an express constitutional exclusion from taxation. *Fifth Third Union Trust* is irrelevant.

{¶ 64} The majority opinion concludes from these three cases that "the CAT is 'measured by' sales." But only one of the cases it relies on uses sales as a measure, and then as part of a complicated formula in which sales are only one factor. This court has again cobbled together incongruent cases with an implausible rationale to conclude that a straightforward provision of the Constitution is inapplicable to the situation before it. See *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 173 (Pfeifer, J., dissenting). If only the Constitution of Ohio were entitled to a presumption of applicability.

{¶ 65} In its discussion of the structure of Sections 3(C) and 13, Article XII, the majority opinion states that "by permitting franchise *and* excise taxes but limiting *only* excise taxes, Section 3(C) implies that taxes on the privilege of

doing business are not subject to its food-sales limitations." (Emphasis sic.) To the contrary, it is likely that no thought was given to this distinction. 1975 Am.H.J.R. No. 15 states, as to Section 3, that "[t]he remaining portion of section 7, Article XII and sections 8, 10, and 12 of that Article are repealed and reenacted as a single new section 3."

{¶ 66} Violating the rule of construction against reading more words into the text than are there, *Bernardini v. Conneaut Area City School Dist. Bd. of Edn.* (1979), 58 Ohio St.2d 1, 4, 12 O.O.3d 1, 387 N.E.2d 1222, the majority concludes that "sales or other excise taxes," in Section 13, Article XII includes only those "excise taxes *that resemble* sales taxes." (Emphasis sic.) Majority opinion at ¶ 29. That conclusion is indefensible, despite the majority's reference to the venerable rule of ejusdem generis.

{¶ 67} In distinguishing between excise and "privilege of doing business" taxes, the majority opinion blithely ignores the fact that franchise taxes are excise taxes, as conceded by the Attorney General. Excise taxes have long been known to encompass franchise taxes. *Cincinnati, Milford & Loveland Traction Co. v. State* (1916), 94 Ohio St. 24, 27, 113 N.E. 654, paragraph two of the syllabus ("An excise tax is a tax assessed for some special privilege or immunity granted, * * * and in the case of a corporation, it is sometimes spoken of as a franchise tax"). There is no credible reason for the majority opinion to differentiate franchise taxes from excise taxes.

{¶ 68} Although the majority opinion's discussion on the history of Sections 3(C) and 13 is interesting, it is also irrelevant. We only look at legislative history when a provision is ambiguous, see R.C. 149(C), which Sections 3(C) and 13 are not.

{¶ 69} This court in answering the question before us is burdened by a questionable legal principle, which requires us to presume that any statute enacted by the General Assembly is constitutional. This court has not seriously looked at

this presumption in decades. The presumption has taken on a life of its own apart from whatever merits ever precipitated its institution.

{¶ 70} The presumption of constitutionality is suspect because it originates from a fallacy: that a conflict between a constitutional provision and a statute is the same as a conflict between two statutes. In *State ex rel. Evans v. Dudley* (1853), 1 Ohio St. 437, 441, 1853 WL 50, this court stated, "As repeals by implication are not favored, the repugnancy between the provisions of two statutes must be clear, and so contrary to each other that they cannot be reconciled, in order to make the latter operate a repeal of the former. This rule is the result of a long course of decisions, and we know of no reason why it does not equally apply, when the repugnancy is alleged to exist, between a constitutional provision and a legislative enactment." See also *Cass v. Dillon* (1853), 2 Ohio St.607, 611, 1853 WL 129, quoting *Dodge v. Gridley* (1840), 10 Ohio 173, 178, 1840 WL 34 ("it was held, that 'when two affirmative statutes exist, one is not to be construed to repeal the other by implication, *unless they can be reconciled by no mode of interpretation.*' In the light of this rule, then, let us examine the provisions of the constitution that are said to be repugnant to the continued existence of the law in question" [emphasis sic]). Every case since 1853 that has relied on the presumption of constitutionality relates back to these cases and therefore relies on the faulty premise that a constitutional provision is the same as a statute for purposes of determining which governs a particular issue.

{¶ 71} Another basic problem with the presumption of constitutionality is that the presumption itself rests on another presumption: "that the Legislature acted with due respect to the Constitution and enacted the law in the belief that it was within legislative power." *State ex rel. Weinberger v. Miller* (1912), 87 Ohio St. 12, 52, 99 N.E. 1078 (Davis, C.J., dissenting). See *State ex rel. Atty. Gen. v. Cincinnati* (1870), 20 Ohio St. 18, 33-34, 1870 WL 2, in which this court explained that the presumption of constitutionality is based on "the presumption

22

that the legislative majority which enacted the statute in question, did so after full and careful investigation, and in the full conviction that what they were doing was within the constitutional grant of legislative power." This court went on to say that "this presumption may not be a very satisfactory one: and, *perhaps*, sometimes members of the legislative department of the government, instead of examining for themselves whether proposed enactments are warranted by the constitution which they are sworn to support, ignore this duty, with a view to throw it over upon the judiciary in the first instance." (Emphasis sic.) Id. at 34, 1870 WL 2.

{¶ 72} The doubts expressed by Chief Justice Davis in *Weinberger* and Chief Justice Brinkerhoff in *Atty. Gen.* are well placed. Even the most casual observer of the General Assembly is aware that members do not always carefully consider the constitutionality of the legislation they vote for or against. They do not thereby abuse their trust or duty, but most members are not lawyers, are not steeped in constitutional law, and are not capable of discerning the often fine lines that separate the unconstitutional from the constitutional. Frequently members state that they don't have to consider whether a given law to be enacted is constitutional because this court will ultimately make that determination. It has and it will; to do otherwise is an abdication of our duty. See *Atty. Gen.,* 20 Ohio St. at 33, 1870 WL 2.

{¶ 73} "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, The Path of the Law (1897), 10 Harv.L.Rev. 457, 469. The presumption of constitutionality is based on a fallacy and an unsound presumption, and I would abrogate it.

{¶ 74} Constitutional provisions are not the kin of statutes; they are the paramount law of Ohio. Constitutional provisions are superior to statutes because

23

they derive from the people, the fount of all political power, whereas statutes derive from the General Assembly, which has only the authority delegated to it by the people. *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.* (1852), 1 Ohio St. 77, 85, 1852 WL 11 ("all political power resides with the people"); Federalist No. 78. See *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 ("Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void").

{¶ 75} Given the obvious supremacy of the Constitution, a better rule of construction would be to resolve all doubts in favor of the applicability of the Constitution.

{¶ 76} The historical presumption of constitutionality is backwards. The bottom line is that courts are the ultimate arbiters of what is constitutional, and have been since 1803, and we ought not to be saddled with a presumption that restricts our ability to declare a suspect statute unconstitutional. *Marbury*, 5 U.S. (1 Cranch) at 177, 2 L.Ed. 60 ("an act of the legislature, repugnant to the constitution, is void"). See *Cincinnati, Wilmington & Zanesville RR.,* 1 Ohio St. at 81, 1852 WL 11 ("It seems now, however, to be generally, if not universally conceded, that it is the right, and consequently the duty of the judicial tribunals, to determine, whether a legislative act drawn in question in a suit pending before them, is opposed to the constitution of the United States, or of this State, and if so found, to treat it as a nullity").

{¶ 77} Furthermore, some laws are "presumptively invalid." See, e.g., *R.A.V. v. St. Paul* (1992), 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (content-based regulation restricting free speech); *Nixon v. Shrink Missouri Govt. PAC* (2000), 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (Breyer, J., concurring) (laws subject to strict scrutiny bear a strong presumption *against*

constitutionality); *Bantam Books, Inc. v. Sullivan* (1963), 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity").

{¶ 78} Abrogating the presumption of constitutionality would not lead to chaos. This court would not presume that statutes are unconstitutional. This court would not invalidate all challenged statutes if the presumption of constitutionality were to disappear. See *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.* (1942), 139 Ohio St. 427, 22 O.O. 494, 40 N.E.2d 913 (statute was upheld as constitutional even though presumption of constitutionality was not mentioned). But this court would be less likely to sanction suspect statutes, like the one before us today, if the presumption were not in place. See *Cass*, 2 Ohio St. at 618, 1853 WL 129 ("while we should be careful not to extend the powers of government by far fetched implications, we should be equally careful not to defeat the purpose of the constitution by a narrow and unreasonable construction").

{¶ 79} Even assuming the validity of the presumption of constitutionality, it is clear beyond a reasonable doubt that the CAT violates Section 3, Article XII of the Ohio Constitution. See *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, syllabus ("An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it to be unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible").

{¶ 80} Referring to *Dickman* with approval, this court, in *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 162, 38 O.O.2d 404, 224 N.E.2d 906, stated, "The power to legislate for all the requirements of civil government is the rule, while a restriction upon the exercise of that power in a particular case is the exception." In this case, the restriction, although it may be an exception, is clearly enunciated in Section 3, Article XII.

Today, a majority of this court has defeated the purpose of the constitution, which clearly intends that food, a paramount necessity for over 11 million Ohioans, not be subject to an excise tax. See *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33, 33 O.O. 197, 67 N.E.2d 861 ("food is the greatest necessity of life. A special tax on food is the most unjust and obnoxious that could be levied"). The majority accomplishes its end by narrowly and unreasonably construing numerous cases and by ignoring the obvious purpose behind a constitutional provision that states that "no excise tax shall be levied or collected upon the sale or purchase of food for human consumption off the premises where sold." Instead of merely presuming that the CAT is constitutional, this court has gone out of its way to contort the mainly irrelevant case law it cites to support its conclusion.

{¶ 81} In *Cincinnati, Wilmington & Zanesville,* 1 Ohio St. at 86, 1852 WL 11, we wrote that "it is always legitimate to insist that any legislative enactment, drawn in question, is void, either, because it does not fall within the general grant of power to that body, or because it is expressly prohibited by some provision of the constitution." In *Fletcher v. Peck* (1810), 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162, Chief Justice Marshall wrote that "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." Implication and conjecture are the building blocks of the majority opinion. Clear and strong conviction that an excise tax collected by the state based on the sale of food is prohibited by Section 3, Article XII of the Ohio Constitution flows naturally from any fair reading of its provisions. I dissent.

_____

Chester, Willcox & Saxbe, L.L.P., Gerhardt A. Gosnell II, Charles R. Saxbe, and Donald C. Brey, for appellees.

26

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Stephen P. Carney and Elisabeth A. Long, Deputy Solicitors, and Lawrence D. Pratt and Julie Brigner, Assistant Attorneys General, for appellant.

Maurice Thompson and Joseph Henchman, urging affirmance for amici curiae Buckeye Institute for Public Policy Solutions and Tax Foundation.

Hahn, Loeser & Parks, L.L.P., and Stephen Chappelear, urging affirmance for amicus curiae Ohio Restaurant Association.

Reed Smith, L.L.P., Sara Lima, and Kyle Sollie, urging affirmance for amicus curiae Tyson Sales & Distribution, Inc.

Buckley King, L.P.A., Robert J. Walter, and James E. Melle, urging reversal for amici curiae Ohio AFL-CIO, American Federation of State, County & Municipal Employees Ohio Council 8, Communications Workers of America District 4, Fraternal Order of Police of Ohio, Inc., Ohio Association of Professional Firefighters, Ohio Association of Public School Employees (OAPSE)/AFSCME Local 4, Ohio Education Association, Ohio Federation of Teachers, and Service Employees International Union District 1199.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Mark A. Engel, and Anne Marie Sferra, urging reversal for amici curiae Ohio Manufacturers' Association, Ohio State Medical Association, Ohio Society of Certified Public Accountants, Ohio Dental Association, and Ohio Chemistry Technology Council.

Squire, Sanders & Dempsey, L.L.P., Pierre H. Bergeron, and Thomas D. Amrine, urging reversal for amici curiae Ohio Legal Assistance Foundation, Coalition on Homelessness & Housing in Ohio, Corporation for Ohio Appalachian Development, Ohio Association of Free Clinics, and Ohio Council of Behavioral Health & Family Services Providers.

McDonald Hopkins, L.L.C., Richard C. Farrin, and Thomas M. Zaino; and Porter, Wright, Morris & Arthur, L.L.P., and Kathleen M. Trafford, urging reversal for amicus curiae Ohio Business Roundtable.

Schottenstein, Zox & Dunn Co., L.P.A., Stephen L. Byron, Rebecca K. Schaltenbrand, and Stephen J. Smith; and John Gotherman, urging reversal for amici curiae Ohio Municipal League, County Commissioners Association of Ohio, Ohio Township Association, and Buckeye State Sheriffs' Association.

Taft, Stettinius & Hollister, L.L.P., Fred J. Livingstone, J. Donald Mottley, and Judson D. Stelter, urging reversal for amici curiae Ohio School Boards Association, Buckeye Association of School Administrators, and Ohio Association of School Business Officials.

Shirley Sicilian and Sheldon H. Laskin, urging reversal for amicus curiae Multistate Tax Commission.

_____