[Cite as *Greater Dayton Regional Transit Auth. v. Amalgamated Transit Union AFL CIO Local 1385*, 2018-Ohio-5158.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| GREATER DAYTON REGIONAL TRANSIT AUTHORITY | : | |
| | : | |
| | : | Appellate Case No. 28086 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2017-CV-5094 |
| v. | : | |
| | : | (Civil Appeal from |
| AMALGAMATED TRANSIT UNION AFL CIO LOCAL 1385 | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 21st day of December, 2018.

. . . . . . . . . .

RONALD G. LINVILLE, Atty. Reg. No. 0025803, RYAN A. CATES, Atty. Reg. No. 0085496 and MATTHEW L. ROBERTS, Atty. Reg. No. 0079938, 200 Civic Center Drive, Suite 1200, Columbus, Ohio 43215
      Attorneys for Plaintiff-Appellant

JOSEPH S. PASS, Atty. Reg. No. 0093158, 219 Fort Pitt Boulevard, Pittsburgh, Pennsylvania 15222
      Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Plaintiff-appellant Greater Dayton Regional Transit Authority (hereinafter "RTA") appeals a judgment of the Montgomery County Court of Common Pleas, which overruled its motion to vacate an arbitration award issued in favor of defendant-appellee Amalgamated Transit Union, AFL-CIO, Local 1385 (hereinafter the "Union"). On appeal, RTA argues that the trial court erred when it found that the arbitrator did not exceed his authority under the terms of the collective bargaining agreement between it and the Union. RTA filed a timely notice of appeal with this Court on August 8, 2018.

### Facts and Procedural History

**{¶ 2}** The RTA operates a mass transit system in Dayton, Ohio. The Union represents a bargaining unit of the RTA's bus operators and maintenance employees. A portion of the Union consists of line crew employees who work in the RTA's maintenance department. The line crew employees are responsible for performing "route maintenance," which involves repairing and maintaining the RTA's trolley wires, bus shelters, and route signs. The Union and the RTA are parties to a collective bargaining agreement (hereinafter "CBA") governing their interactions.

**{¶ 3}** In 2015, the RTA began upgrading its technology in several different areas of its business. In particular, the RTA sought to provide its passengers "real time data" when traveling on a bus route. In order to enable this technology, the RTA needed the exact latitude and longitude for each bus stop, thus requiring someone to map and enter the GPS coordinates. The stop would then be assigned a code that could be texted by a passenger in order to obtain the bus location and arrival time. This upgrade required

the modification of existing bus route signs. Specifically, the RTA decided to modify the bottom area of the route signs to include the code to be used by passengers.

{¶ 4} In 2016, the RTA requested bid quotations from outside subcontractors for "geocoding" the latitude and longitude of approximately 3,400 bus stop locations, replacing existing route signs with signs incorporating the new technology, and photographing each bus stop in order to note any maintenance concerns. It is undisputed that the Union was not notified in writing that the RTA was getting bids on the upgrade work from outside subcontractors. The RTA contracted with Sure Signs, Inc. to perform the requested work in return for payment of $58,500. The contract specifically required Sure Signs to remove and replace the bottom section of the bus stop signs. Sure Signs completed the work by September 2016 and notified the RTA of any maintenance issues at the bus stops. Any required maintenance at the individual bus stops was later completed by the RTA line crew.

{¶ 5} On July 6, 2016, prior to the completion of the project, the Union filed a grievance pursuant to Article XXXI of the CBA asserting that the RTA "violated the parties' labor agreement by subcontracting out the repair, removal, and installation of bus signs." The Union and the RTA were unable to resolve the grievance, and the matter was submitted to arbitration pursuant to Sections 6 and 7 of Article XXXI of the CBA. An arbitrator was subsequently appointed, and an arbitration hearing was held on February 2, 2017.

{¶ 6} Of relevance to this appeal, the CBA contains the following provisions that were relied upon by the parties and the arbitrator:

**Article IV – Subcontracting**

\*\*\*

Except for special maintenance, mechanical or similarly, jobs of the type heretofore contracted out, the Authority shall not contract out or otherwise engage persons not in the bargaining unit to perform work heretofore normally and regularly performed by employees within the bargaining unit.

The Authority will have the right to subcontract in the following areas provided it does not lay off any regular employee capable of doing such work with basic job familiarization:

- Pole Setting

- System Demolition

- HVAC Maintenance

- Landscape Maintenance

- Route Maintenance

- Construction of Trolley Overhead Modernization with no reduction of linemen

- Servicing, maintaining, cleaning and repairing the Wright Stop Plaza and the hubs

- Major facility system(s) renovations. In the event the employer considers contracting out a function or service under the major facility system(s) renovations provision, the employer shall provide not less than 30 days advance written notice to the Union. Upon request, the employer shall meet with the Union to discuss the reasons for the

contracting proposal and provide the Union with an opportunity to present alternatives.

The Authority will notify the Union in writing prior to subcontracting any work.

***

CBA, Article IV, p. 4-5.

{¶ 7} On May 11, 2017, the arbitrator issued his Initial Arbitration Award finding that the RTA violated Article IV of the CBA in the following ways: 1) subcontracting with Sure Signs for the "removal of the old bottom and replacement with the new bottom signs, as well as photographing of the poles"; and 2) by failing to notify the Union in writing prior to subcontracting the work. The arbitrator based his conclusion in part upon evidence adduced by the Union that line crew members had regularly performed those types of services in the past as part of their normal work duties.

{¶ 8} We note that the arbitrator found that the RTA was permitted to subcontract the actual geocoding of the bus stops to Sure Signs and therefore did not violate the CBA in that respect. The arbitrator based this finding upon evidence adduced at the hearing that the geocoding was "not work heretofore normally and regularly performed by" the line crew.

{¶ 9} Lastly, the arbitrator found that because the RTA was permitted to subcontract the geocoding to Sure Signs, it would be improper to award the entire amount of the subcontract ($58,500) to the Union as a remedy for the RTA's violation of Article IV of the CBA. Accordingly, the arbitrator remanded the matter to the parties to determine an appropriate monetary remedy, "if any." The arbitrator instructed the parties to notify

him if they were unable to reach an agreement. The parties were unable to reach an agreement, and both parties submitted briefs to the arbitrator with respect to the proposed economic remedy.

{¶ 10} On September 19, 2017, the arbitrator issued his Final Arbitration Award, in which he concluded back pay for the line crew members was the appropriate remedy. Specifically, the arbitrator found that Sure Signs spent approximately 1,760 man hours on the bus stop project, and that the project would have resulted in more overtime for the line crew members. The arbitrator also found, however, that "it is unlikely [that] the Line Crew would have worked an additional 1,760 hours of overtime in 2016." Rather, the arbitrator found the 880-hour figure asserted by the Union to be reasonable, because that number accounted for the overtime hours already worked by the line crew in 2016. Thus, the arbitrator awarded the Union the sum of $35,024, or $3,502.40 for each member of the ten-man line crew.

{¶ 11} On October 30, 2017, the RTA filed a motion to vacate the arbitration award, in which it argued that the arbitrator exceeded his authority by "imposing additional limitations on the RTA's right to subcontract 'route maintenance' projects that are not expressly provided for in the contract." The RTA argued that Article IV of the CBA allowed it to subcontract route maintenance work, provided that "no bargaining unit member capable of doing the work with basic job familiarization is laid off." Because no members of the line crew were laid off as result of the subcontract with Sure Signs, the RTA argued that the CBA was not violated. The RTA also argued that the final arbitration award should be vacated because the award was without rational support and was not derived from the terms of the CBA. Essentially, the RTA contended that the arbitrator

erred by holding that it violated Article IV of the CBA by hiring subcontractors to perform work that the Union had previously carried out.   Lastly, the RTA argued that the Union failed to present sufficient evidence to support the award of the $35,024 in back pay to the line crew, and the arbitrator therefore erred in making that determination.

{¶ 12} On November 29, 2017, the Union filed a memorandum in opposition to the RTA's motion to vacate and an application to confirm the arbitrator's award.   In a decision issued on July 12, 2018, the trial court overruled the RTA's motion to vacate the arbitration award.   Specifically, the trial court found that the arbitrator "acted within his authority in fashioning both an Interim Arbitration Award and a Final Arbitration Award that draw their essence from the parties' agreement, and there is a rational nexus between the collective bargaining agreement and the awards."   Thus, the trial court granted the Union's application to confirm the arbitrator's award and entered judgment in favor of the Union in the amount of $35,024, equal to $3,502.40 for each member of the ten-man line crew.

{¶ 13} It is from this judgment that the RTA now appeals.

{¶ 14} Because they are interrelated, the RTA's first and second assignments of error will be discussed together as follows:

THE MONTGOMERY COUNTY COURT OF COMMON PLEAS ERRED IN ITS FINAL AND APPEALABLE DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD DATED JULY 12, 2018, BY OVERRULING PLAINTIFF/APPELLANT GREATER DAYTON REGIONAL TRANSIT AUTHORITY'S MOTION TO VACATE ARBITRATION AWARD DATED OCTOBER 30, 2017.

THE MONTGOMERY COUNTY COURT OF COMMON PLEAS ERRED IN ITS FINAL AND APPEALABLE DECISION AND ENTRY GRANTING DEFENDANT'S APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD DATED JULY 12, 2018, BY CONFIRMING DEFENDANT/APPELLEE AMALGAMATED TRANSIT UNION, LOCAL 1385'S APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD DATED NOVEMBER 29, 2017.

{¶ 15} In its first and second assignments, the RTA contends that the trial court erred when it overruled the motion to vacate and confirmed the arbitration award in favor of the Union. Specifically, the RTA argues that the arbitrator exceeded his authority when he imposed additional limitations on the RTA's right to subcontract "route maintenance" projects that are not provided for in Article IV of the CBA.

{¶ 16} "Appellate review of an arbitration award is confined to an evaluation of the judicial order confirming, modifying, or vacating the award; we do not review the merits of the arbitrator's award." *Sicor Secs., Inc. v. Albert*, 2d Dist. Montgomery No. 22799, 2010-Ohio-217, citing *Warren Edn. Assn. v. Warren City Bd. of Edn.*, 18 Ohio St.3d 170, 174, 480 N.E.2d 456 (1985)(Additional citations omitted.). Because arbitration is a creature of private contract, courts must ignore errors of fact or law by the arbitrator. *Piqua v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 185 Ohio App.3d 496, 2009-Ohio-6591, 924 N.E.2d 876, ¶ 18 (2d Dist.).

Judicial review of arbitration awards is limited in order to encourage parties to resolve their disputes with arbitration. This has long been public policy in Ohio. The state and courts encourage arbitration because it

"provides parties with a relatively speedy and inexpensive method of conflict resolution and has the additional advantage of unburdening crowded court dockets." Appellate courts must ensure that trial courts, the front line of arbitral review, do not exceed the scope of their review authority. Otherwise, "[a]rbitration, which is intended to avoid litigation, would instead merely become a system of 'junior varsity trial courts' offering the losing party complete and rigorous de novo review." Thus, judicial review of an arbitrator's award is strictly limited, "and where a reviewing court exceeds the permissible scope of review such judgment will be reversed."

(Internal citations omitted.) *Id.* at ¶ 16. We review the trial court's order de novo. *Id.* at ¶ 15; *United Ohio Ins. Co. v. Central Mut. Ins. Co.*, 2d Dist. Darke No. 2010 CA 21, 2011-Ohio-2432, ¶ 15.

**{¶ 17}** "The grounds upon which a trial court may vacate an arbitrator's award are few and narrow." *FOP, Ohio Labor Council, Inc.* at ¶ 19, citing *Dayton v. Internatl. Assn. of Firefighters*, 2d Dist. Montgomery No. 21681, 2007-Ohio-1337. R.C. 2711.10 identifies four grounds upon which a common pleas court may vacate an arbitration award: fraud, corruption, misconduct, and the arbitrator exceeded his or her powers. The RTA relies upon R .C. 2711.10(D), which authorizes a common pleas court to vacate an arbitration award when "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." The essential function of R.C. 2711.10(D) is "to ensure that the parties get what they bargained for by keeping the arbitrator within the bounds of the authority they gave him." *FOP, Ohio Labor Council, Inc.* at ¶ 21.

**{¶ 18}** "An arbitrator derives his authority from the express terms of the collective-bargaining agreement between the parties." *Fostoria v. Ohio Patrolmen's Benevolent Assn.*, 106 Ohio St.3d 194, 2005-Ohio-4558, 833 N.E.2d 720, ¶ 11. "Arbitrators act within their authority to craft an award so long as the award 'draws its essence' from the contract—that is, 'when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful.' " *Cedar Fair, L.P. v. Falfas*, 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, ¶ 7, quoting *Mahoning Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.*, 22 Ohio St.3d 80, 488 N.E.2d 872 (1986), paragraph one of the syllabus. "[A]n award 'departs from the essence of a [contract] when: (1) the award conflicts with the express terms of the agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement.' " (Brackets sic.) *Id.*, quoting *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emps. Assn., Local 11, AFSCME, AFL-CIO*, 59 Ohio St.3d 177, 572 N.E.2d 71 (1991), syllabus.

**{¶ 19}** In his Initial Arbitration Award issued on May 11, 2017, the arbitrator stated the following:

> Article IV is not a model of clarity. It provides in paragraph six (6) that the [RTA] shall not contract out work normally and regularly performed by the bargaining unit, and in the very next paragraph sets forth that it can subcontract in certain areas provided no bargaining unit member capable of doing the work with basic job familiarization is laid off. * * * It lists the eight (8) areas where the Authority can subcontract, but does not define the terms, particularly "Route Maintenance," which is at issue here. Typically,

specific language controls or limits general language. This leads the Arbitrator to the conclusion that work normally and regularly performed by the Line Crew is generally not to be contracted out, but "Route Maintenance" work can be so long as no bargaining unit member capable of doing the work with basic job familiarization is laid off.

As noted above, the term "Route Maintenance" is not defined. Looking at the practice between the parties, though, gives some idea as to the "Route Maintenance" that can be contracted out. Stevens testified that route maintenance includes tree trimming, bus shelters, trash cans, and signage, that the [RTA] has contracted out shelter cleaning, tree trimming, cleaning out the feeder wire, and, possibly, pole foundations, and that the Union did not grieve any of these. On the other hand, there is no real dispute that the installation, repair, and replacement of the bus signs has historically been performed by the bargaining unit and the contract with Sure Signs specifically included removing and replacing the bottom sections of the signs. * * * Furthermore, Stevens gave no specific example of sign work that had been contracted out. This leads the Arbitrator to conclude that replacing the bottom placards of the bus signs is bargaining unit work that should have been performed by the Union.

The geocoding of the poles is another matter. Hecker testified to one (1) instance where he geocoded poles for about a week, although other Line Crew also worked on it. He was not exactly certain what equipment he used, supporting that this is not work regularly done by the bargaining unit.

Additionally, the geocoding done here was part of a system wide upgrade in the RTA's technology, further supporting that it is not work heretofore normally and regularly performed by the bargaining unit. The Arbitrator concludes that contracting out the geocoding of the sign locations did not violate the Agreement.

This leaves the photographing of the poles. The record revealed that Hecker now photographs poles whenever he puts up a new sign, so the bargaining unit has done this work regularly. The Arbitrator concludes that contracting out the photographing of the poles violated the Agreement.

*Id.* at pgs. 20-21.

**{¶ 20}** As previously stated, RTA asserts that Article IV of the collective bargaining agreement allows it to subcontract route maintenance work, so long as "no bargaining unit member capable of doing the work with basic job familiarization is laid off." According to the RTA, since none of the line crew members were laid off as a result of the subcontract with Sure Signs, no violation of the CBA occurred. The RTA argues that the arbitrator exceeded his authority under R .C. 2711.10(D) when he found that the RTA may not subcontract route maintenance projects if Union employees previously performed the work. The RTA asserts that Article IV of the CBA contains no such restriction on its ability to subcontract route maintenance projects, and the arbitrator erred when he inserted the additional limitation into the CBA. The RTA argues that "it makes no difference whether the Union has performed the work in the past."

**{¶ 21}** The RTA cites several cases in support of its general proposition that Ohio courts consistently vacate arbitration awards where the arbitrator issues an award that

conflicts with the express terms of the contract. *See Internatl. Assn. of Firefighters Local 136 v. Dayton*, 2d Dist. Montgomery No. 26346, 2015-Ohio-898, ¶ 17 (where the trial court determined that the arbitrator's award was without rational support, that there was no rational nexus between the award and the agreement, and that the award conflicted with express terms of the agreement, the trial court properly concluded that the arbitrator had exceeded his powers and properly vacated the award); *Eastlake v. Fraternal Order of Police/Ohio Labor Council*, 11th Dist. Lake No. 2010-L-057, 2011-Ohio-2201, ¶ 40-43 (after finding that the arbitrator exceeded his authority when he interpreted a collective bargaining agreement's holiday-pay article as allowing all police officers to cash out ten days of holiday pay per year, the trial court properly vacated the arbitration award; the arbitrator's award conflicted with the express terms of the agreement and was not a justified or necessary interpretation of the agreement); *Amalgamated Transit Union, Local 627 v. S.W. Ohio Regional Transit Auth.*, 190 Ohio App.3d 679, 2010-Ohio-5494, 943 N.E.2d 1075, ¶ 10 (1st Dist.) (the arbitrator exceeded his authority by failing to grant the Union the relief required by the agreement*); Huber Hts. v. Fraternal Order of Police*, 73 Ohio App.3d 68, 596 N.E.2d 571 (2d Dist.1991) (arbitrator exceeded his authority by awarding plaintiff five days' pay because the award was inconsistent with the provisions of the collective bargaining agreement).

{¶ 22} The RTA also argues that the arbitrator "imposed additional limitations on the RTA's right to subcontract route maintenance projects." In support of its argument, the RTA cites to *City of Mt. Healthy v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 2017-Ohio-9117, 101 N.E.2d 1163, ¶ 9, 11 (1st Dist.), in which the appeals court affirmed the trial court's decision to vacate an arbitration award. In that case, the arbitrator's

finding that a probationary period could not be extended without a part-time officer's personal consent conflicted with both applicable law and the parties' collective bargaining agreement. Under the terms of the CBA, the FOP had sole and exclusive authority to represent all part-time patrolmen in matters concerning the terms and conditions of employment. *Id.* at ¶ 9. In other words, the officer's personal consent was unnecessary, since the FOP was granted the authority to act on behalf of its members. *Id.* Thus, the appeals court held that, because the arbitrator exceeded his power by fashioning an award that did not draw its essence from the CBA, the trial court did not err in granting the city's motion to vacate the arbitrator's award or in failing to grant the FOP's motion to confirm. *Id.* at 11.

{¶ 23} Upon review, we agree with the trial court and find no merit to the RTA's argument that the arbitrator misinterpreted the CBA and/or imposed additional limitations on the RTA's right to subcontract route maintenance projects. While the RTA argued that "it makes no difference whether the Union has performed the work in the past," the arbitrator read Article IV of the CBA as a whole and concluded that it was proper for him to consider the past performance of the parties in determining the definition of "route maintenance." Additionally, the arbitrator found that Article IV specifically provided that "work normally and regularly performed by the Line Crew is generally not to be contracted out, but 'Route Maintenance' work can be so long as no bargaining unit member capable of doing the work with basic job familiarization is laid off." Initial Arbitration Award at 20. Although RTA argues that the arbitrator violated the "basic tenant of contract law" that specific provisions control over general language, the arbitrator specifically referenced this rule in concluding that work normally performed by the line crew should not be

subcontracted.

{¶ 24} Thereafter, the arbitrator interpreted Article IV as permitting the RTA to subcontract route maintenance projects if that work had not regularly been performed by the line crew in the past. The arbitrator then found that the RTA violated the CBA by subcontracting with Sure Signs for the removal and replacement of the bottom of the signs, as well as the photographing of the poles. Significantly, the arbitrator found that the RTA did *not* violate Article IV of the CBA by subcontracting with Sure Signs for the geocoding of the bus stop signs, thereby undermining any argument from the RTA that the arbitrator's award effectively restricted it from subcontracting any route maintenance projects to third parties. The record establishes that the arbitrator simply interpreted the language in Article IV, which he correctly characterized as not "a model of clarity." The arbitrator did not misconstrue the provisions Article IV, nor did he impose any additional limitations on the parties. In our view, the arbitrator acted within the scope of the parties' collective bargaining agreement and did not exceeded his powers within the meaning of R.C. 2711.10(D) when he interpreted Article IV the CBA. The arbitrator's interpretation was drawn from the essence of the parties' agreement, and there was a rational nexus between the CBA and the arbitrator's award.

{¶ 25} Additionally, even if we were to find that the arbitrator misinterpreted Article IV of the CBA, it would be improper for this Court to substitute its own interpretation. In *Kettering Health Network v. CareSource,* 2d Dist. Montgomery No. 27233, 2017-Ohio-1193, we recently stated the following:

> In response to each of the above agreement-interpretation arguments, the trial court determined that the arbitrator had acted within the

scope of his power, and the court declined to revisit * * * the arbitrator's interpretations. The trial court is correct. The parties' gave the arbitrator the power to interpret and construe their agreements. An arbitrator does not exceed his powers when he interprets a contract incorrectly. *See Cedar Fair*, 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, at ¶ 6 (saying that "[a]n arbitrator's improper determination of the facts or misinterpretation of the contract does not provide a basis for reversal of an award by a reviewing court"). Indeed, " '[i]t is not enough * * * to show that the [arbitrator] committed an error—or even a serious error.' " *Id.*, quoting *Stolt-Nielsen, S.A. v. Animal Feeds Internatl. Corp.*, 559 U.S. 662, 671, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). Rather, as the U.S. Supreme Court has said, in determining whether the arbitrator exceeded his powers, "the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all." *Oxford Health Plans LLC v. Sutter*, __ U.S. __, 133 S.Ct. 2064, 2071, 186 L.Ed.2d 113 (2013). If the arbitrator interpreted the contract incorrectly, well, that was part of the deal:

> All we say is that convincing a court of an arbitrator's error—even his grave error—is not enough. So long as the arbitrator was "arguably construing" the contract * * * a court may not correct his mistakes under § 10(a)(4) [authorizing a federal court to vacate an award when an arbitrator exceeds his powers]. The potential for those mistakes is the price of agreeing

to arbitration.

> *Id.* at 2070, quoting *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). Here, the arbitrator was interpreting the parties' agreements, which he had the power to do. So "[t]he arbitrator's construction holds, however good, bad, or ugly." *Oxford* at 2071.

*Id.* at ¶ 26. Therefore, having found that the arbitrator did not exceed the scope of his powers within the meaning of R.C. 2711.10(D) when he interpreted Article IV the CBA, the trial court did not err when it confirmed the arbitrator's award to the Union.

**{¶ 26}** Lastly, we note that the RTA does not provide any specific argument on appeal that the trial court erred when it confirmed the arbitrator's economic award of $35,024 to the Union. Nevertheless, upon review we conclude that the trial court did not err when it confirmed the economic award.

**{¶ 27}** In the absence of language restricting the arbitrator to award a particular remedy, the arbitrator has the implicit authority to fashion a remedy in making the award, even where the CBA is silent on the topic of remedial authority. *Miller v. Gunckle*, 96 Ohio St.3d 359, 2002-Ohio-4932, 775 N.E.2d 475, ¶ 19-20, citing *Queen City Lodge No. 69, Fraternal Order of Police v. Cincinnati*, 63 Ohio St.3d 403, 588 N.E.2d 802 (1992) (arbitrator can award prejudgment interest and set date from which interest accrued). "[T]he power to award a remedy is generally part and parcel of the arbitration process." *Queen City Lodge* at 405. In general, the parties expect that the arbitrator, upon finding a violation, "will proceed to award a remedy of some type." *Id.* An arbitrator has "broad authority" to fashion a remedy. *Cedar Fair,* 140 Ohio St.3d 447, 2014-Ohio-3943, 19

N.E.3d 893, ¶ 6; *Bd. of Trustees of Miami Twp. v. Fraternal Order of Police*, 81 Ohio St.3d 269, 273, 690 N.E.2d 1262 (1998).

{¶ 28} In the instant case, the arbitrator specifically stated the "the Agreement is silent regarding the criteria the Arbitrator should apply in determining the appropriate remedy for a contract violation. It is widely accepted that, by such silence, the parties have vested the Arbitrator with broad discretion to determine an appropriate remedy when there is a violation." Final Arbitration Award at 4. The record establishes that the arbitrator properly considered the arguments submitted by the parties regarding an economic remedy and the amount to be awarded. As noted by the trial court, the arbitrator considered the amount of overtime pay already accrued by line crew members in 2016 in ultimately holding that the Union's 880-hour figure was reasonable as "[i]t accounts for the additional 455 overtime hours worked by the Line Crew and factors in the likelihood that the RTA would have scheduled the work to avoid too much additional overtime[,] as well as the reduction for the time spent geocoding." *Id.* at 6.

{¶ 29} In light of the foregoing, we conclude that the trial court did not err when it confirmed the arbitrator's economic award of $35,024 to the Union. We agree with the trial court that the award did not conflict with the express terms of the CBA and was rationally derived from the terms of this agreement. The arbitrator acted within his authority in fashioning an economic award that drew its essence from the CBA, and there was a rational nexus between the CBA and economic award. Accordingly, we find that the arbitrator did not exceed his authority in crafting such an economic remedy. *See Cedar Fair* at ¶ 7.

{¶ 30} The RTA's first and second assignments of error are overruled.

{¶ 31} Both of the RTA's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies sent to:

Ronald G. Linville
Ryan A. Cates
Matthew L. Roberts
Joseph S. Pass
Hon. Dennis J. Langer