[Cite as *Greater Dayton Regional Transit Auth. v. Amalgamated Transit Union AFL CIO Local 1385*, 2019-Ohio-393.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| GREATER DAYTON REGIONAL TRANSIT AUTHORITY | : | |
| | : | |
| | : | Appellate Case No. 28090 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2018-CV-1904 |
| v. | : | |
| | : | (Civil Appeal from |
| AMALGAMATED TRANSIT UNION AFL CIO LOCAL 1385 | : | Common Pleas Court) |
| | : | |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of February, 2019.

. . . . . . . . . . .

RONALD G. LINVILLE, Atty. Reg. No. 0025803, RYAN A. CATES, Atty. Reg. No. 0085496 and MATTHEW L. ROBERTS, Atty. Reg. No. 0079938, 200 Civic Center Drive, Suite 1200, Columbus, OH 43215
        Attorneys for Plaintiff-Appellant

JOSEPH S. PASS, Atty. Reg. No. 0093158, 219 Fort Pitt Boulevard, Pittsburgh, PA, 15222
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Greater Dayton Regional Transit Authority ("RTA") appeals a Montgomery County Court of Common Pleas judgment that overruled RTA's motion to vacate an arbitration award in favor of Amalgamated Transit Union AFL-CIO Local 1385 ("the Union"), granted the Union's motion for an order confirming that arbitration award, and confirmed the arbitration award. The judgment of the trial court will be affirmed.

### Factual Background and Procedural History

{¶ 2} RTA operates a mass transit system that provides the Greater Dayton, Ohio region with three types of transportation services: 1) regular, fixed-route bus service, 2) electric trolley service, and 3) Project Mobility paratransit service ("PMOB"). The Americans with Disabilities Act ("ADA") requires public transit systems such as RTA to provide PMOB in order to guarantee that individuals with cognitive or physical disabilities who are unable to use RTA's other services have equal access to transportation. Qualified PMOB customers call RTA's dispatch center to schedule a trip, then are picked up from their home at the scheduled time, transported to their chosen destination, and later returned home. In order to comply with expectations imposed by the Federal Transit Authority, RTA strives for a "zero denial rate" with its PMOB service, which means fulfilling all requests for rides made by qualified PMOB users.

{¶ 3} For many years, RTA and the Union have been parties to a series of collective bargaining agreements ("CBA") that cover RTA's bus operators and other employees. (*See, e.g.*, Trial Court Docket ("Doc.") #1, Exh. A (2016-2019 CBA) and Exh. C (12/19/17 Hearing Transcript ("Tr.")), RTA Exh. 3 (excerpts from successive CBAs from 1991 through 2015)). When RTA first implemented PMOB in 1991, *all* PMOB driving

responsibilities were contracted out to other entities. In 1995, RTA moved PMOB in-house, with most PMOB trips being covered by RTA's Union drivers. However, in reliance on a provision in each CBA that permitted RTA to "contract out or otherwise engage persons not in the bargaining unit" to perform "jobs of the type heretofore contracted out,"[1] RTA continued to contract out a small portion[2] of PMOB trips to third-party taxicabs.

{¶ 4} In their 2000-2003 CBA, the parties agreed to add a new provision relative to PMOB services, as follows:

> In order to improve service and achieve the zero denial rate, [RTA] may contract up to maximum of $50,000 when short term PMOB customer demand exceeds RTA service capabilities.

(Doc. #1, Exh. C, RTA Exh. 3, p. 10 of 2000-2003 CBA, Article IV(A), Section 8). That

---

[1] *See* Doc. #1, Exh. A, Article IV, p. 6, and Exh. C, RTA Exh. 3, Article IV, p. 2 of 1991-1994 CBA; p. 4 of 1994-1997 CBA; p. 6 of 1997-2000 CBA; p. 8 of 2000-2003 CBA; p. 12 of 2003-2006 CBA; p. 16 of 2006-2009 CBA; p. 21 of 2010-2012 CBA; & p. 25 of 2012-2015 CBA.

[2] According to RTA, the subcontracted PMOB service has amounted to less than two percent of all PMOB trips.

provision remained in effect through the 2012-2015 CBA.[3]

{¶ 5} During 2015 negotiations for a new CBA, RTA proposed that the foregoing provision (i.e., the one capping the amount RTA may spend on subcontracted PMOB service) be removed in its entirety, to allow RTA to "outsource [PMOB] service to a third party provider." (*See* Doc. #1, Exh. C, Union Exh. 3, Article IV(A), p. 6). The provision thereafter was eliminated from the 2016-2019 CBA. (*See* Doc. #1, Exh. A, Article IV(A), p. 7). However, the practice of subcontracting PMOB services continued without formal objection from the Union until early 2017, when the Union filed a grievance alleging that RTA had violated the CBA by subcontracting PMOB driving duties that constitute "bargaining unit work."

{¶ 6} The current CBA includes a comprehensive grievance and arbitration procedure that sets forth specific steps to be followed to resolve any disputes between the parties. (*See* Doc. #1, Exh. A, Article XXXI). Disputes not resolved through the grievance process may be submitted to an impartial arbitrator. (*See id.*, Sections 6 & 7). The arbitrator's powers are limited to "interpreting and applying the provisions of" the CBA. (*Id.*, Section 8). The CBA further provides in pertinent part as follows:

Section 9 – Arbitrator's Decision Conclusive

A decision, with opinion, shall be rendered by the arbitrator within a

reasonable time following the hearing and shall be final and binding

upon both parties.

(*Id.*, p. 38).

---

[3] *See* Doc. #1, Exh. C, RTA Exh. 3, p. 13 of 2003-2006 CBA; p. 18 of 2006-2009 CBA; p. 22 of 2010-2012 CBA; & p. 27 of 2012-2015 CBA.

{¶ 7}   When the parties were unable to resolve their dispute regarding RTA's use of non-Union PMOB drivers, the matter was submitted to arbitration before a mutually-selected neutral arbitrator. On December 19, 2017, the arbitrator conducted a hearing at which both parties presented witnesses and documentary evidence. (*See* Doc. #1, Exh. C, Tr. and exhibits thereto). Over RTA's objection, the arbitrator at that time also allowed the Union to introduce evidence related to another pending arbitration. (*See* Doc. #1, Exh. B, Arbitration Award, pp. 2-3).

{¶ 8} On March 12, 2018, the arbitrator issued an award in favor of the Union and its PMOB drivers. (*See id.*). The arbitrator found that RTA had violated the current CBA in two respects: 1) by subcontracting RTA work without prior written notice to the Union, in violation of Article IV of the CBA (*see* Doc. #1, Exh. A, 2016-2019 CBA, p. 6), and 2) by using "buses leased or otherwise obtained from other companies or persons, the effect of which would be to deprive the members of the bargaining unit to [sic] work heretofore normally and regularly performed by them * * *," also in violation of Article IV of the CBA. (*Id.*, p. 5).

{¶ 9} In so finding, the arbitrator expressly rejected RTA's position that eliminating from the 2016-2019 CBA the provision allowing RTA to "contract up to maximum of $50,000" to outside PMOB providers[4] actually gave RTA "*greater* flexibility to supplement PMOB" with outside providers. (Emphasis added.) (*See* Doc. #1, Exh. B, Arbitration Award, p. 6). To the contrary, the arbitrator found that by removing not only the $50,000 cap but also the language authorizing RTA to contract for PMOB services, the 2016-2019

---

[4] *See* Doc. #1, Exh. C, RTA Exh. 3, p. 10 of 2000-2003 CBA; p. 13 of 2003-2006 CBA; p. 18 of 2006-2009 CBA; p. 22 of 2010-2012 CBA; & p. 27 of 2012-2015 CBA.

CBA eliminated RTA's authority to subcontract *any* PMOB service. (Doc. #1, Exh. B, Arbitration Award, pp. 10-11). Although RTA urged that such subcontracting falls within the still-remaining provision allowing RTA to "contract out or otherwise engage persons not in the bargaining unit" to perform "jobs of the type heretofore contracted out" (*see* Doc. #1, Exh. A, Article IV, p. 6), the arbitrator disagreed. Applying "[t]he age old rule of *ejusdem generis*," the arbitrator concluded that the "heretofore contracted out" provision on which RTA relied "does not refer to operator's work," but rather "is about the work of maintenance and mechanical workers" only. (Doc. #1, Exh. B, Arbitration Award, p. 10). He thus ordered RTA "to cease and desist" subcontracting PMOB services, to give the Union prior written notice of any plans to subcontract future PMOB work, and to pay damages in the amount of $29,521.41 for wages lost by Union operators due to past subcontracting of PMOB services. (*Id.*, p. 12).

{¶ 10} Pursuant to R.C. 2711.10(D), RTA moved in the common pleas court to vacate the arbitration award. (Doc. #1). The Union opposed RTA's motion and moved pursuant to R.C. 2711.09 for an order confirming that award. (Docs. #12, 13). On July 19, 2018, the common pleas court entered a judgment confirming the arbitration award. (Doc. #17).

{¶ 11} RTA appeals from that judgment, raising two assignments of error:

1) The Montgomery County Court of Common Pleas erred in its Decision and Judgment Entry Confirming Arbitration Award dated July 19, 2018, by overruling [RTA]'s Motion to Vacate Arbitration Award dated May 1, 2018.

2) The Montgomery County Court of Common Pleas erred in its Decision

and Judgment Entry Confirming Arbitration Award dated July 19, 2018, by confirming [the Union]'s Motion for Order Confirming Award dated May 31, 2018.

### Standard of Review

**{¶ 12}** "Appellate review of an arbitration award is confined to an evaluation of the judicial order confirming, modifying, or vacating the award; we do not review the merits of the arbitrator's award." *Sicor Secs., Inc. v. Albert*, 2d Dist. Montgomery No. 22799, 2010-Ohio-217, citing, *e.g.*, *Warren Edn. Assn. v. Warren City Bd. of Edn.*, 18 Ohio St.3d 170, 174, 480 N.E.2d 456 (1985). Because arbitration is a creature of private contract, courts must ignore errors of fact or law by the arbitrator. *Piqua v. Fraternal Order of Police*, 185 Ohio App.3d 496, 2009-Ohio-6591, 924 N.E.2d 876, ¶ 18 (2d Dist.). In that case, we stated as follows:

Judicial review of arbitration awards is limited in order to encourage parties to resolve their disputes with arbitration. This has long been public policy in Ohio. The state and courts encourage arbitration because it "provides parties with a relatively speedy and inexpensive method of conflict resolution and has the additional advantage of unburdening crowded court dockets." Appellate courts must ensure that trial courts, the front line of arbitral review, do not exceed the scope of their review authority. Otherwise, "[a]rbitration, which is intended to avoid litigation, would instead merely become a system of 'junior varsity trial courts' offering the losing party complete and rigorous de novo review." Thus, judicial review of an arbitrator's award is strictly limited, "and where a reviewing court exceeds

the permissible scope of review such judgment will be reversed."

(Internal citations omitted.) *Piqua* at ¶ 16. We review the trial court's order de novo. *Id.* at ¶ 15; *United Ohio Ins. Co. v. Central Mut. Ins. Co.*, 2d Dist. Darke No. 2010 CA 21, 2011-Ohio-2432, ¶ 15.

{¶ 13} "The grounds upon which a trial court may vacate an arbitrator's award are few and narrow." *Piqua* at ¶ 19, citing *Dayton v. Internatl. Assn. of Firefighters*, 2d Dist. Montgomery No. 21681, 2007-Ohio-1337. R.C. 2711.10 identifies four such grounds: fraud, corruption, misconduct, or the arbitrator exceeded his or her powers. Under R.C. 2711.10(D), a common pleas court may vacate an arbitration award when "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." The purpose of R.C. 2711.10(D) is "to ensure that the parties get what they bargained for by keeping the arbitrator within the bounds of the authority they gave him." *Piqua* at ¶ 21.

{¶ 14} "An arbitrator derives his authority from the express terms of the collective-bargaining agreement between the parties." *Fostoria v. Ohio Patrolmen's Benevolent Assn.*, 106 Ohio St.3d 194, 2005-Ohio-4558, 833 N.E.2d 720, ¶ 11. "Arbitrators act within their authority to craft an award so long as the award 'draws its essence' from the contract – that is, 'when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful.' " *Cedar Fair, L.P. v. Falfas*, 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, ¶ 7, quoting *Mahoning Cty. Bd. of Mental Retardation & Dev. Disabilities v. Mahoning Cty. TMR Edn. Assn.*, 22 Ohio St.3d 80, 488 N.E.2d 872 (1986), paragraph one of the syllabus. "[A]n award 'departs from the essence of a [contract] when: (1) the award conflicts with the express terms of the

agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement.' " (Brackets sic.) *Id.*, quoting *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emps. Assn.*, 59 Ohio St.3d 177, 572 N.E.2d 71 (1991), syllabus.

### Analysis of Trial Court Judgment

{¶ 15} Although RTA sets forth its position as separate assignments of error, those two assignments rest on a single proposition. In brief, RTA argues that the trial court erred in failing to recognize that the arbitrator exceeded the scope of his authority by rendering the arbitration award at issue. More specifically, RTA contends that the arbitrator refused to enforce the existing CBA, "effectively nullified" a CBA provision on which RTA has premised its PMOB operations for decades, and substituted his own judgment in place of the contract terms to which the parties actually agreed.

{¶ 16} After reviewing the record de novo, we are unable to conclude that the trial court erred in determining that the arbitrator did *not* exceed the scope of his authority in reaching the arbitration award. The applicable CBA explicitly empowers a neutral arbitrator chosen by the parties to interpret provisions of that agreement and apply them to disputes between the parties. (*See* Doc. #1, Exh. A, Article XXXI, Section 8). In exercising that authority, the arbitrator reached conclusions that "draw [their] essence" from the CBA, in that "there is a rational nexus between the agreement and the award." *See Cedar Fair* at ¶ 7.

#### a. Effect of Eliminating Article IV(A) of Prior CBAs

{¶ 17} RTA challenges the arbitrator's conclusion that, by removing from the 2016-2019 CBA a former provision that set a $50,000 limit on subcontracted PMOB services,

the parties agreed not merely to eliminate any *cap* on the cost of PMOB services that may be subcontracted, but to eliminate *altogether* RTA's right to subcontract such services. While in effect from 2000 to 2015, that provision appeared under the heading "Project Mobility (PMOB) Operators" and stated:

> In order to improve service and achieve the zero denial rate, [RTA] may contract up to maximum of $50,000 when short term PMOB customer demand exceeds RTA service capabilities.

(Doc. #1, Exh. C, RTA Exh. 3, p. 10 of 2000-2003 CBA, Article IV(A), Section 8).[5] Following the removal of that provision, no reference to contracting out PMOB services appeared anywhere under the current CBA's "Project Mobility (PMOB) Operators" heading. (*See* Doc. #1, Exh. A, Article IV(A), p. 7). Accordingly, a rational basis exists in the contract language for the arbitrator's conclusion that removal of the foregoing "maximum of $50,000" provision also eliminated RTA's authority to subcontract PMOB services. The trial court did not err by so determining.

### b. Interpretation of Article IV of 2016-2019 CBA/"heretofore contracted"

{¶ 18} RTA asserts, however, that the foregoing conclusion ignores the parties' prior history of conduct as to PMOB services. The Union apparently does not dispute RTA's observation that RTA contracted PMOB services to outside drivers even before the "maximum of $50,000" provision was inserted into the 2000-2003 CBA, and that the Union was aware of but raised no objection to that practice previously. RTA thus maintains that removal of the "maximum of $50,000" provision had no effect on RTA's authority to subcontract PMOB services except to allow RTA to do so without limitation

---

[5] *See also* fn.3, above.

on the cost of the services that could be subcontracted. According to RTA, its authority to subcontract PMOB services always derived from an entirely different provision that has appeared consistently in all agreements between the parties since the 1991-1993 CBA. That provision, which falls under the "Subcontracting" heading, states as follows:

> Except for special maintenance, mechanical or similarly, jobs of the type heretofore contracted out, the Authority [RTA] shall not contract out or otherwise engage persons not in the bargaining unit to perform work heretofore normally and regularly performed by employees within the bargaining unit.[6]

(Doc. #1, Exh. A, 2016-2019 CBA, Article IV, p. 6).[7] Because RTA had subcontracted at least portions of PMOB work to outside drivers since the inception of the PMOB program, RTA asserts that PMOB services are "jobs of the type heretofore contracted out" within the meaning of that clause.

{¶ 19} The arbitrator, however, rejected RTA's interpretation of the exception for subcontracting "jobs of the type heretofore contracted out." (*See* Doc. #1, Exh. B, Arbitration Award, pp. 9-10). Applying "[t]he age old rule of *ejusdem generis*," the arbitrator determined that the subject provision "is referring to maintenance or mechanical

---

[6] In another appeal involving the arbitrator's interpretation of the same provision, we recently noted that the language of Article IV is, as characterized by the arbitrator in that case, "not 'a model of clarity.' " *Greater Dayton Regional Transit Auth. v. Amalgamated Transit Union AFL CIO Local 1385*, 2d Dist. Montgomery No. 28086, 2018-Ohio-5158, ¶ 24.

[7] See also Doc. #1, Exh. C, RTA Exh. 3, Article IV, p. 2 of 1991-1994 CBA; p. 4 of 1994-1997 CBA; p. 6 of 1997-2000 CBA; p. 8 of 2000-2003 CBA; p. 12 of 2003-2006 CBA; p. 16 of 2006-2009 CBA; p. 21 of 2010-2012 CBA; & p. 25 of 2012-2015 CBA.

work" only. (Emphasis sic.) (*Id.*, p. 10). He explained "[t]he Doctrine of Ejusdem Generis" as follows:

> When parties follow a list of specific items with a more general or inclusive term, it is assumed that they intend to include under the latter only terms that are like the specific ones, that is, if [sic] the same general nature or class of those enumerated, unless it is shown that a broader scope was intended.

(Citation omitted.) (*Id.*). The arbitrator concluded that the relevant paragraph from the current CBA "does not refer to operator's work," and does not authorize RTA to subcontract PMOB driving. (*Id.*).

**{¶ 20}** Significantly, RTA does not claim that the arbitrator misstated "[t]he Doctrine of Ejusdem Generis" or that such doctrine is not a valid legal principle.[8] Rather, RTA argues that in applying that doctrine to this CBA, the arbitrator "went rogue" and exceeded his authority by interpreting the contract in a manner for which the Union never argued and that "rendered the subcontracting exception meaningless." The trial court did not err by finding to the contrary.

**{¶ 21}** The CBA expressly authorizes the arbitrator to "interpret[ ] * * * the provisions of th[at] Agreement." (Doc. #1, Exh. A, 2016-2019 CBA, Article XXXI, Section 8, p. 38). Nowhere does the CBA limit the arbitrator to considering only interpretations for

---

[8] In fact, the Ohio Supreme Court applied "the rule of ejusdem generis," reading a later term as "embracing only things of a similar character as those comprehended by the preceding limited and confined terms," when interpreting a statute at issue in *Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 29. This court, too, has employed that rule of construction. *See, e.g., State v. Vaduva*, 2016-Ohio-3362, 66 N.E.3d 212, ¶ 25 (2d Dist.).

which a party to the dispute affirmatively advocates, nor does RTA identify any other authority for the proposition that the arbitrator was so limited. Additionally, the authority to interpret a contract implicitly includes the authority to apply recognized principles of contract construction. Irrespective of the rule of ejusdem generis, the CBA's "heretofore contracted out" language undisputedly carves out an exception to what otherwise is a general prohibition on subcontracting Union work. (*See id.*, Article IV, p. 6). The trial court did not err by concluding that the arbitrator acted within the scope of his authority in narrowly construing that exception. (See Doc. #17, p. 4).

{¶ 22} Furthermore, the arbitrator's interpretation does not "render[ ] * * * meaningless" Article IV's exception permitting RTA to subcontract certain types of work. Instead, the arbitrator's interpretation would limit that exception to only "maintenance" or "mechanical" jobs previously "contracted out." Although such interpretation seemingly excludes any contractual authority for RTA to have contracted out PMOB work over the previous 20+ years, the prospect that RTA may have been operating in contravention of the contract language is not a basis for reversing the arbitrator's decision. The issue before the trial court was not whether the arbitrator interpreted the CBA *correctly*[9] or whether the trial court would have interpreted it differently, but whether the arbitrator's interpretation "conflicts with the express terms of the agreement" or the CBA language provides "rational support" for the arbitrator's conclusion. *See Cedar Fair,* 140 Ohio St.3d 447, 2014-Ohio-3943, 19 N.E.3d 893, at ¶ 7. Because the arbitrator's interpretation did

---

[9] "Parties, by agreeing to allow an arbitrator to resolve their disputes, also implicitly agree to be bound by the mistakes the arbitrator makes while carrying out his charge." *Kettering Health Network v. CareSource*, 2d Dist. Montgomery No. 27233, 2017-Ohio-1193, ¶ 29, quoting *Piqua*, 185 Ohio App.3d 496, 2009-Ohio-6591, 924 N.E.2d 876, at ¶ 18.

*not* conflict with other express contract language and rational support for that interpretation can be found within the language of Article IV of the 2016-2019 CBA, the trial court did not err by finding that the arbitrator did not exceed his authority in that regard.

c. ***Interpretation of Article IV of 2016-2019 CBA/"buses * * * from other[s]"***

**{¶ 23}** After determining that the "heretofore contracted out" provision of the 2016-2019 CBA did not entitle RTA to subcontract PMOB work (Doc. #1, Exh. B, Arbitration Award, pp. 9-11), the arbitrator went on to find that RTA also had violated a different portion of Section IV of the current CBA by contracting such work to non-Union operators. (Doc. #1, Exh. B, Arbitration Award, pp. 11). The provision identified by the arbitrator states as follows:

> The Authority [RTA] shall not lease or otherwise transfer its buses, or use buses leased or otherwise obtained from other companies or persons, the effect of which would be to deprive the members of the bargaining unit to [sic] work heretofore normally and regularly performed by them * * *.

(Doc. #1, Exh. A, 2016-2019 CBA, Article IV, p. 5).

**{¶ 24}** RTA deems it "undisputed" that RTA "has not 'leased' or 'obtained' vehicles from other companies to supplement PMOB." However, we cannot say that the arbitrator exceeded his authority by concluding that RTA's use of Uber drivers and private taxicabs to transport PMOB passengers amounted to "obtain[ing] vehicles from other companies or persons," in violation of the foregoing provision. We also cannot say that the arbitrator's interpretation of "buses" as encompassing private taxicabs and other private vehicles lacked any "rational nexus between the agreement and the award." *Cedar Fair* at ¶ 7.

Because the arbitrator's award was not arbitrary, capricious or unlawful in that respect, the trial court did not err by declining to overturn the award on that basis.

{¶ 25} Moreover, even were we to conclude (which we do not) that the arbitrator's interpretation of the word "buses" or "obtained" was so overly broad as to exceed the scope of his authority, that still would not warrant a conclusion that the trial court erred in upholding the arbitration award. Because the arbitrator did not exceed his authority by interpreting the "heretofore contracted out" exception to the CBA's general prohibition on subcontracting as applying only to maintenance and mechanical work, the CBA was devoid of any other provision on which RTA's entitlement to subcontract PMOB services could be premised. Absent an applicable exception to the general prohibition on contracting out Union work, the arbitrator did not need to rely on Article IV's more specific prohibition against "us[ing] buses leased or otherwise obtained from other companies or persons" in order to find that RTA was in violation of the CBA's terms. The trial court's decision cannot be overturned based on the arbitrator's interpretation of "buses" or "obtained."

### d. Consequences of Decision on RTA's Provision of PMOB Services

{¶ 26} Finally, RTA claims that affirming the trial court's decision "would have a disastrous effect" on RTA and the disabled community in the greater Dayton region. We certainly hope, as we expect the Union does also, that such a result will not occur. However, the potential consequences of the trial court's decision are not a factor that we may consider in reviewing the lower court's judgment. Given that we are "confined to an evaluation of the judicial order" and also may "not review the merits of the arbitrator's award," *Sicor Secs.,* 2d Dist. Montgomery No. 22799, 2010-Ohio-217, RTA's request that

the judgment be reversed on that basis is not well taken.

## *Conclusion*

**{¶ 27}** RTA's assignments of error are overruled in their entirety, and the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Ronald G. Linville
Ryan A. Cates
Matthew L. Roberts
Joseph S. Pass
Hon. Richard Skelton